COMMONWEALTH *vs.* LEONARD JACKSON.

Bristol. January 7, 2005. - October 31, 2006.

Present: MARSHALL, C.J., GREANEY, COWIN, & CORDY, JJ.

*Homicide. Practice, Criminal,* Voluntariness of statement, Admissions and confessions, Assistance of counsel, Probable cause hearing. *Constitutional Law,* Admissions and confessions, Assistance of counsel, Arrest, Probable cause. *Evidence,* Admissions and confessions. *Arrest. Probable Cause.*

A criminal defendant failed to demonstrate that his statements to police were not voluntary beyond a reasonable doubt; were not preceded by a knowing, intelligent, and voluntary waiver of his Miranda rights; were obtained in violation of his right to counsel; or were tainted by an allegedly illegal arrest. [612-614]

There was no merit to a criminal defendant's arguments that he was not afforded a judicial determination of probable cause within twenty-four hours of his warrantless arrest [614], or that he was intentionally deprived of his statutory right under G. L. c. 276, § 33A, to make a timely telephone call from the police station [614-615].

INDICTMENTS found and returned in the Superior Court Department on March 11, 1999.

Pretrial motions to suppress evidence were heard by *Daniel F. Toomey,* J., and *Patrick F. Brady,* J., and the cases were tried before *John A. Tierney,* J.; after appeal and remand by this court, further proceedings were had before *Robert J. Kane,* J.

*Chrystal A. Murray* for the defendant.

*David B. Mark,* Assistant District Attorney (*Chris Markey,* Assistant District Attorney, with him) for the Commonwealth.

CORDY, J. Following a jury trial, Leonard Jackson was found guilty of premeditated murder and the unlawful possession of a firearm.[1] The centerpiece of the Commonwealth's evidence at trial was Jackson's confession and, to a lesser extent, the content of a series of false statements made to police over several days leading up to it. The confession and most of Jackson's state-

---

[1]Leonard Jackson was found not guilty of armed robbery.

ments were videotaped, and those tapes were admitted in evidence. Other witnesses were called by the Commonwealth to show that Jackson had lied to the police in his initial statements, and to corroborate some of the details of his later confession.

On appeal, Jackson claims that his confession should have been suppressed because it was the product of an illegal arrest for which there was no probable cause; involuntary; and not preceded by a knowing, intelligent, and voluntary waiver of his Miranda rights. In two pro se memoranda,[2] Jackson further contends that he was not afforded a judicial determination of probable cause within twenty-four hours of his warrantless arrest, as required by *Jenkins* v. *Chief Justice of the Dist. Court Dep't*, 416 Mass. 221 (1993); and was denied his statutory right, under G. L. c. 276, § 33A, to make a timely telephone call from the police station. We conclude that Jackson's arguments are without merit and affirm his convictions. After reviewing the entire proceedings, including the videotapes, pursuant to G. L. c. 278, § 33E, we also decline to exercise our power to reduce the murder verdict or order a new trial.

1. *Background.* At trial, the jury heard evidence from which they could have found the following. Jackson was a friend of the victim, Edgar Kelley; had previously stayed in his apartment; and sold drugs for him. Several days before Christmas, 1998, Jackson obtained a .38 caliber firearm for the purpose of killing Kelley. On December 27, Jackson shot Kelley in the back of the head after he had been let into Kelley's apartment, and Kelley had turned and begun walking down a short hall to his bedroom. After killing him, Jackson took, among other things, the keys to Kelley's leased automobile, a PlayStation video game player, and blank money orders, and fled out the back door.

2. *Jackson's confession.* On December 29, 1998, the police found Kelley's body. On December 30, they found Kelley's

---

[2] The memoranda were filed in support of Jackson's pro se motion to be released from unlawful restraint pursuant to Mass. R. Crim. P. 30 (a), as appearing in 435 Mass. 1501 (2001). Because they were filed after the case had been transferred to this court, the motion and memoranda were docketed here, and we will consider the claims they raise in connection with Jackson's direct appeal.

leased automobile parked two blocks from Jackson's apartment in Fall River. The vehicle had been "wiped down." The police also learned that Jackson had made at least one call from Kelley's cellular telephone number and had been seen driving Kelley's leased automobile around the time that Kelley apparently had been killed. Based on this and other information, the police obtained a warrant to search Jackson's apartment. They executed the warrant on the morning of December 31. Jackson was not at the apartment. At 1:15 P.M. that afternoon, police officers spotted Jackson on a street in Fall River.[3] The officers stopped their cruiser and approached him. At no point did either officer draw a weapon. One officer frisked Jackson and removed his wallet. The other told him that he was not under arrest and asked whether he would be willing to go to the police station for questioning. Jackson nodded his assent. Another cruiser arrived and Jackson got in.

At the police station, Jackson was informed of his Miranda rights, and was questioned for the remainder of the afternoon. He denied any knowledge of Kelley's murder. After a dinner break, the questioning continued. Based on inconsistencies with statements made by other persons being interviewed simultaneously, the police decided to videotape the remainder of Jackson's interview. Jackson was again informed of and waived his Miranda rights. The recorded questioning continued from 6:06 P.M. to 7:20 P.M. At 7:20 P.M., the police informed Jackson that he had a right to be promptly presented "before the court if then in session and if not, at its next session," and that he had a "right to a judicial determination of probable cause within twenty-four hours" if he were arrested without a warrant (collectively, his "presentment rights").[4] Jackson was then asked if

---

[3]At the time they observed Jackson, the police officers were transporting Dwayne Alves, Kelley's neighbor and a suspect in the murder, in their cruiser.

[4]These two rights have different origins. Massachusetts case law has long required that an arrested person be brought before the court for arraignment as soon after arrest as possible. See *Commonwealth* v *DiStasio*, 294 Mass. 273, 284 (1936), and cases cited; *Keefe* v. *Hart*, 213 Mass. 476, 481 (1913). See also Mass. R. Crim. P. 7 (a), as appearing in 442 Mass. 1506 (2004). The right to a judicial determination of probable cause to arrest within twenty-four hours of a warrantless arrest, although constitutionally based, was announced

he wished to waive those rights and "to keep talking to us." Jackson responded by stating that he wanted to speak to an attorney.[5] The police questioning ceased, and one of the officers left the room. When he returned a few minutes later, Jackson had his coat on and was ready to leave. The officers then placed him under arrest for the murder of Edgar Kelley.

After his arrest, Jackson was left in the conference room with an officer assigned to sit with him while arrangements were made for him to be booked. The officer did not speak to Jackson. After five to seven minutes, Jackson said, "murder," then, "I didn't murder anybody," "I don't care anymore," and "It doesn't matter anymore, if I'm under arrest for murder, then I may as well tell you the truth." He then made several statements about the murder. The officer left the conference room to report Jackson's statements to the investigating officers. Two officers returned to the conference room and asked Jackson whether he wanted to explain what he had just said. Jackson said he did. He was again informed of his Miranda rights and his presentment rights, both of which he waived.[6] Jackson made no further request for counsel. In the videotaped interview that followed, Jackson denied any involvement in Kelley's murder, but told the police that Alves had killed Kelley because of a debt that Alves could not repay. Jackson also told the police that he had helped Alves take Kelley's automobile, but only after Kelley had been killed. Following the interview, Jackson was booked, made a telephone call, and was placed in a cell and assigned the status of a person showing suicidal tendencies.[7]

---

in *Jenkins* v. *Chief Justice of the Dist. Court Dep't,* 416 Mass. 221, 237-238 (1993).

Both rights are triggered by an arrest; it is unusual that they would have been recited to someone who had not yet been arrested, and it is apparent from the videotape that they alarmed Jackson and prompted him to ask to speak to an attorney. See note 5, *infra.*

[5] The Commonwealth concedes this point. Jackson stated, "[W]e can talk. I don't really care about talking. It's just the way you're asking me questions and stuff, and I don't really want to — you know what I'm saying, screw myself or anything . . . in any type of say, so I would rather have someone that can talk — be some type of counsel for me."

[6] Jackson waived these rights both orally and in writing. The oral waiver was videotaped.

[7] The police also took Jackson's clothes for forensic examination and provided him with surgical "scrubs" that he wore for the next three days.

He was observed sleeping through the night (and the next night) without incident.

The following day, January 1, 1999, was the beginning of a three-day holiday weekend. The police officers recommenced their videotaped questioning of Jackson at around 2:25 P.M. Jackson was informed of and waived his Miranda rights and his presentment rights. He continued to insist that it was Alves who killed the victim and that his own involvement was only after the fact.

On January 2, Jackson told a police officer that he did not feel well, was depressed, and had been previously hospitalized. As a result, the police transported him to the Corrigan Mental Health Center (center) for evaluation. At the center, a medical history was taken and Jackson was examined by a physician. The physician determined that Jackson was depressed but not clinically depressed, did not need to be hospitalized, and safely could be held at the police station pending his arraignment.[8] The physician prescribed two medications he thought might be helpful, one for "sleep problems" and one as a "mood stabilizer." These medications were neither purchased nor administered. Jackson was then returned to the police station.[9]

At the police station, one of the officers told Jackson that he had spoken to Alves and knew what had happened, and that "[w]e're here if you want to talk to us." Shortly thereafter, Jackson indicated that he would like to speak to an officer. At 6:20 P.M., officers met with Jackson and asked what he wanted to talk about. The questioning that ensued was videotaped. At its commencement, Jackson waived his Miranda and presentment rights. He then proceeded to confess to killing Edgar Kelley with a single shot to the back of the head after he was let into the apartment and had locked the front door. He claimed that the killing was justified and that he was God. Jackson went on to describe the details of the killing and its aftermath, includ-

---

[8]The physician also noted that Jackson had been diagnosed previously as having bipolar disorder.

[9]The doctor testified, at a hearing on Jackson's motion to suppress, that he did not perceive an emergency situation requiring the medications, and did not view it as a cause for concern that Jackson had not received the medications that day.

ing how he wrapped the victim's head in blue bed sheets and put a plastic bag over it. He also told police that he had disposed of the weapon by throwing it into a dumpster.[10]

3. *Motions to suppress.* a. *The first motion.* Before trial, Jackson filed a motion to suppress all of his statements on the grounds that (1) the statements were involuntary; (2) the police officers continued to question him after he had expressed a desire for counsel; and (3) the police had delayed in arresting him on December 31, thus deferring the triggering of his presentment rights until the opportunity for judicial relief that day had evaporated. After hearing extensive testimony over the course of four days, including the testimony of the physician who examined Jackson at the center and a medical expert called by the defense, and after reviewing the videotapes of Jackson's interviews, the judge denied the motion.[11]

In denying Jackson's motion, the judge first found that "[p]rior to each occasion of custodial interrogation, defendant was fully and clearly advised of his several Miranda rights and he waived his rights knowingly, intelligently and voluntarily." He then found that Jackson's answers were "free and voluntary, uncoerced by either physical or psychological forces." The judge rejected Jackson's "somewhat bizarre allusions to the forces that he perceived to have impelled his homicidal conduct," finding instead that his "election to proffer his bizarre motivations was purposefully manipulative and the product of both a rational intellect and a free will." The judge also found that Jackson's exchange with police officers after he requested counsel was initiated by him free from any police compulsion or solicitation and was a voluntary and knowing abandonment of that request. Finally, the judge found that Jackson was not arrested until 7:20 P.M. on December 31, and his presentment rights only accrued at that time.[12] Jackson's subsequent statements either were within six hours of his arrest, as required by

---

[10]The weapon was never recovered.

[11]The judge also reviewed other exhibits, including medical records, Miranda forms, and presentment forms.

[12]The police admittedly did not have probable cause to arrest Jackson when they first encountered him at 1:15 P.M. on December 31.

*Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996), or were preceded by a knowing, intelligent, voluntary, and written waiver of his presentment rights. *Id.*[13] Therefore, the judge concluded that Jackson's statements were "uninfected with any constitutional, rule or common law disease."

b. *The second motion.* After Jackson's motion to suppress was denied, new counsel was appointed. Jackson then filed a supplementary motion to suppress, claiming that his arrest at 7:20 P.M. on the evening of December 31, was unlawful because it was not supported by probable cause. Another evidentiary hearing was held before a different judge.

In denying Jackson's motion, the judge found that the following was known to police when they arrested Jackson on December 31:

"1. Defendant had several items belonging to the deceased, including his cell phone, police scanner, apartment keys, possibly a blank money order, and his leased vehicle.

"2. The defendant apparently lied to the police about his whereabouts . . . near the time when the homicide may have occurred. Several witnesses saw him in the vicinity [of the deceased's apartment during this same period of time].

"3. Defendant apparently lied to police about his use of the deceased's leased vehicle . . . found near the defendant's apartment [and] wiped . . . clean of fingerprints.

"4. The defendant inquired about transportation to New York after becoming aware that the police had found the body.

---

[13]In *Commonwealth* v. *Rosario*, 422 Mass. 48, 56 (1996), the court held that an "otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest (day or night), or if (at any time) the defendant made an informed and voluntary written . . . waiver of his right to be arraigned without unreasonable delay."

"5. The victim's apartment was entered without force. The defendant had the keys to the apartment.

"6. A black male, wearing a black hat with a New York insignia, was seen . . . in the rear of the apartment . . . appearing nervous. A hat matching the description was found in defendant's apartment when the search warrant was executed on December 31[]."

Based on these findings, the judge concluded that the police had probable cause to arrest Jackson.

4. *Trial.* The principal issues at Jackson's trial were the waiver of his Miranda rights, the voluntariness of his confession, and the reliability of that confession. Videotapes of the confession and the several statements that preceded it were introduced in evidence and played for the jury. At the conclusion of the evidence, the trial judge instructed the jury that, before they could consider Jackson's statements, the Commonwealth needed to "prove to you beyond a reasonable doubt" that Jackson had made the statements and that he made them "voluntarily, freely, and rationally." The judge emphasized that the burden was on the Commonwealth to prove beyond a reasonable doubt that Jackson's will had not been overcome; that he had not been coerced, tricked, or cajoled into making the statements; and that the statements were made after Jackson had received, understood, and waived his Miranda rights. It is apparent that the jury found that Jackson's statements were voluntary and preceded by a knowing and voluntary waiver of his rights.

Jackson also contended at trial that the lack of forensic evidence linking him to the crime, combined with certain admissions in his confession that were inconsistent with the Commonwealth's evidence, should cause the jury to reject the confession as unreliable. Among other inconsistencies, Jackson claimed that the location of Kelley's body (found in the bedroom) was contrary to where he described the killing to have occurred (in the hallway). He also pointed to the failure of the police to find the gun in the dumpster where he claimed he disposed of it after he shot Kelley. The jury heard but rejected

these claimed inconsistencies as sufficient to put the reliability of the confession in doubt.[14,15]

5. *Remand.* The verdicts were appealed to this court, and we heard oral argument in January, 2005. After argument, the case was remanded to the Superior Court for further findings regarding the circumstances of Jackson's initial encounter with the police and his transport to the police station for questioning. We specifically instructed that on remand the judge was to "hear the necessary evidence and determine whether the defendant went voluntarily or was seized without probable cause when he was brought to the police station in the early afternoon of December 31, 1998." We also instructed that, if the judge concluded that Jackson was unlawfully seized, he was to "consider whether the defendant's subsequent statements to the police were 'fatally infected' by the unlawful arrest." After hearing live testimony and reviewing the testimony from previous hearings designated by the parties, the remand judge (not the trial judge) made extensive findings, ultimately concluding that Jackson was not taken into custody by police but "went voluntarily to the police station" for questioning at 1:15 P.M., and was not arrested until 7:25 P.M. that evening. Additional

---

[14]This is unsurprising. A careful examination of the confession and the evidence belies any significant inconsistency. The hallway is very short and leads directly into the bedroom where Kelley entertained his visitors. In addition, the confession came six days after the shooting, and the fact that the weapon was not in the dumpster at that time is not inconsistent with its having been thrown there six days before.

[15]Between the first and second day of deliberations, the judge was made aware that one of the male jurors had contacted a Boston Globe reporter looking for information about a case that he thought might be helpful to him in the deliberations. After consulting with defense counsel and the prosecutor, the judge made individual inquires of the jurors, and identified the juror who made the call. After further questioning, the judge found that the juror had spoken about this to one other sitting juror and to an alternate juror. The judge then dismissed and replaced the juror who had spoken to the reporter and removed the alternate juror from the pool. He then questioned the sitting juror to whom the juror had spoken, and found that he remained impartial. The judge directed the jury to start their deliberations from the beginning. Jackson did not object to these steps, and the matter is not raised in his appeal. We have, however, reviewed the transcripts as part of our review under G. L. c. 278, § 33E, and find neither error nor a substantial likelihood of a miscarriage of justice.

briefs were submitted to this court in January and March of 2006. We declined to hear further argument.

6. *Discussion.* We address each of Jackson's arguments in turn. a. *The confession.* Jackson maintains that the denial of his motions to suppress was error. He contends that because of his mental state, the daily interrogations, and the length and conditions of his confinement at the police station, he did not knowingly, intelligently, and voluntarily waive his right not to incriminate himself, and that his confession on January 2, 1999, was not voluntary beyond a reasonable doubt. While the Commonwealth had the burden of proving to both the judge and the jury the voluntariness of the statements, see *Commonwealth* v. *Hunter,* 416 Mass. 831, 834-835 (1994), *S.C.,* 427 Mass. 651 (1998), we cannot say that that burden was not met in this case. The trial judge (and subsequently the jury) viewed the videotapes and had the benefit of hearing the testimony of the officers and the physicians presented by both parties. His findings that Jackson was rational at the time he made the statements, that his free will had not been overborne, and that he had knowingly, intelligently, and voluntarily waived his Miranda rights are supported in the record.[16] While the length of Jackson's confinement at the police station and his inability to obtain the medications prescribed at the center are troubling in light of his mental history, each of these factors was carefully examined by the judge, and his findings were not clearly erroneous. *Commonwealth* v. *Kincaid,* 444 Mass. 381, 384 (2005), quoting *Commonwealth* v. *Tavares,* 385 Mass. 140, 156, cert. denied, 457 U.S. 1137 (1982) ("finding of fact by the trial judge will not be deemed 'clearly erroneous' unless the reviewing court on the entire evidence is left with the firm conviction that a mistake has been committed").

Jackson's further argument that he was deprived of his right to counsel when he was interrogated after requesting counsel

---

[16]It is well established that the fact that a defendant may have been suffering from a psychotic condition before and after statements were made does not compel a conclusion that the statements were involuntary. *Commonwealth* v. *Benoit,* 410 Mass. 506, 515 (1991).

also fails on the facts found by the judge who heard the first motion to suppress. Those findings include the following: the police immediately stopped questioning Jackson when he asked to speak to an attorney; shortly thereafter, while awaiting booking, Jackson made unsolicited statements to the officer assigned to watch him about his knowledge of the murder; those statements led to the recommencement of questioning before which Jackson was fully advised of and voluntarily waived his Miranda rights; and after being advised of those rights, Jackson no longer sought counsel.

Based on these findings, the judge's conclusion that Jackson's right to counsel was not violated is amply supported by Federal and Massachusetts precedent. See *Edwards* v. *Arizona*, 451 U.S. 477, 484-485 (1981) (where defendant asserts right to counsel during interrogation, police may not question him without counsel unless he initiates further communication); *Commonwealth* v. *LeClair*, 445 Mass. 734, 738 (2006) (no violation of right to counsel where defendant's remarks to police after invoking right to counsel "evinced a desire for more conversation about the killing," and further substantive questioning commenced after defendant freely and voluntarily waived right); *Commonwealth* v. *Rankins*, 429 Mass. 470, 472-473 (1999) (knowing initiation by defendant and valid waiver found where defendant invoked right to counsel, stated that he wanted to continue to talk three minutes later, and received repeated Miranda warnings).

Finally, Jackson contends that he was arrested when the police transported him to the police station for questioning at 1:15 P.M. on December 31, at a time when the police admittedly did not have probable cause to arrest him. Accordingly, he argues that his statements at the police station were tainted by the illegal arrest and, thus, inadmissible. The remand judge, however, found that Jackson went to the police station voluntarily, and was not taken into custody until he was arrested at 7:25 P.M. Jackson argues, however, that the judge's ruling on remand was error as a matter of fact and law. There was no error. The judge's ultimate finding and his subsidiary findings on which it was

based are readily supported by the evidence that was before him.[17]

b. *The lack of a judicial determination of probable cause.* Due process requires that when an arrest occurs without a warrant, a determination of probable cause must be made by a neutral and detached magistrate as soon as reasonably possible, but no more than twenty-four hours after the arrest. *Jenkins* v. *Chief Justice of the Dist. Court Dep't*, 416 Mass. 221, 237 (1993). Jackson argues that no determination of probable cause to arrest was made within that time. His argument fails because Jackson executed a valid waiver of this right (which had been fully explained to him) within one hour of his arrest on the evening of December 31, 1998, and again the next day. Similarly, any claim under *Commonwealth* v. *Rosario*, 422 Mass. 48 (1996), that his confession was the result of interrogation taking place more than six hours after his arrest and confinement was waived when he waived his right to a prompt presentment. See *id.* at 56.

c. *G. L. c. 276, § 33A.* Jackson was advised of his statutory right to make a telephone call (and in fact made one) at the time he was booked on the charge of murder. That did not occur until approximately 11:15 P.M., four hours after his arrest, and G. L. c. 276, § 33A, requires that a person under arrest be advised of this right at the time he arrives at the police station, and that he be afforded an opportunity to make a call within one hour thereafter. Jackson did not raise this issue in the trial court, and it is therefore waived. Consequently, we consider only whether any noncompliance with the statutory requirements resulted in a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Randolph*, 438 Mass. 290, 293-296 (2002).

The reason for the delay is apparent from and understandable in the circumstances. Within minutes of being placed under arrest and while he was waiting to be booked, Jackson initiated

---

[17]On appeal, Jackson does not contest the second motion judge's ruling that the police had probable cause when they arrested him shortly after 7:20 P.M. on December 31, 1998. In any event, the judge's findings regarding the facts known by the police at that time plainly support the existence of probable cause.

discussion with the police officers, indicating a willingness to tell them what he knew about the murder. He then waived his right to counsel. The interview that followed extended for several hours. We need not decide whether the police were under an obligation to adjourn the interview and inquire whether Jackson wished to make a telephone call, because there is no evidence that this oversight was intentional. If it was not intentional, the remedy of suppression is not available. Compare *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 266 (1982) (suppression not appropriate where evidence insufficient to support intentional deprivation of G. L. c. 276, § 33A, right), with *Commonwealth* v. *Jones*, 362 Mass. 497, 503 (1972) (suppression appropriate where police intentionally prevented defendant from making telephone call). There is no substantial likelihood of a miscarriage of justice resulting from any technical noncompliance with the statute in these circumstances.

7. *Conclusion.* None of Jackson's claims on appeal warrant the reversal of his convictions. After a complete review of the record pursuant to G. L. c. 278, § 33E, including the videotaped interviews,[18] the circumstances surrounding his prolonged detention at the police station over the New Year's holiday weekend, and the testimony regarding his mental state at the time he confessed to the murder, we further conclude that the interests of justice do not require that we reduce the defendant's murder conviction to a lesser degree of guilt or order a new trial.

*Judgments affirmed.*

---

[18]The videotapes were invaluable to our review of Jackson's confession and the motion judge's rulings that it was voluntary and preceded by a series of knowing, voluntary, and intelligent waivers. See *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 440-449 (2004).