Commonwealth *vs.* Melvin Martinez.

Suffolk. September 14, 2010. - January 19, 2011.

Present: Marshall, C.J., Ireland, Spina, Cordy, Botsford, & Gants, JJ.[1]

*Evidence,* Admissions and confessions, Alias, Relevancy and materiality, Identity. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Practice, Criminal,* Admissions and confessions, Voluntariness of confession, Waiver, Arraignment, Agreement between prosecutor and defendant, Plea, Instructions to jury, Capital case. *Waiver.*

There was no error in the denial of a criminal defendant's pretrial motion to suppress a statement he gave to the police six hours after having been read his Miranda rights, where the judge correctly concluded that the defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent, and therefore valid [691-693]; and where the judge's conclusion that the defendant's statement was voluntarily made was supported by his findings that the defendant was questioned in Spanish (his native language), was not restrained, was coherent, did not appear to be under the influence of drugs or alcohol or stress, and never indicated he wanted to end the interview or stop cooperating with police [693-694].

At a murder trial, there was no error in the admission of a defendant's statement to the police, where the statement was taken within the six-hour safe harbor period following his arrest. [694-697]

In the circumstances of a criminal trial, there was no abuse of discretion or error in the judge's declining to bar the use of the defendant's nickname. [697-698]

At a criminal trial, the judge did not err in permitting the prosecutor to question a key prosecution witness who was testifying pursuant to a plea agreement about his obligation under the agreement to testify truthfully, where that questioning was limited to redirect examination of the witness following the impeachment of the witness by defense counsel on cross-examination. [698-700]

At a murder trial, there was no error in the denial of the defendant's motion for a mistrial on the basis of extraneous influence on the jury caused by the jury's viewing of a memorial to the victim during their view of the crime scene, where the judge's instruction about the memorial as part of his final charge to the jury cured any possible prejudice. [700-701]

Indictments found and returned in the Superior Court Department on September 9, 2002.

A pretrial motion to suppress evidence was heard by *Elizabeth*

[1]Chief Justice Marshall participated in the deliberation on this case prior to her retirement.

*B. Donovan*, J., and the cases were tried before *Patrick F. Brady*, J.

*Richard J. Shea* for the defendant.

*Macy Lee*, Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. In January of 2007, a Suffolk County jury found the defendant, Melvin Martinez, guilty of the aggravated rape of Monica Mejia and of her murder on a theory of felony-murder.[2] On appeal, the defendant claims error in the admission of his statement to the police and the repeated mention of his nickname, "Pinocchio," at trial. He also argues that the credibility of a key prosecution witness who testified pursuant to a plea agreement was enhanced improperly by the prosecutor's references to the witness's obligation to testify truthfully, and that the jury were impermissibly biased by seeing, during a view, a memorial erected in the victim's memory. For the reasons we discuss, we reject the defendant's claims, and, after reviewing the entire record, conclude there is no basis on which to grant the defendant relief pursuant to G. L. c. 278, § 33E. Accordingly, we affirm the defendant's conviction of murder in the first degree.

1. *Facts.* We summarize the facts as the jury could have found them based on the evidence introduced at trial, reserving other facts for later discussion. On the evening of July 16, 2002, the victim attended a party at 115 Washington Avenue in Chelsea. The defendant, known to a number of the residents of the apartment only as "Pinocchio," was also there. The victim and the defendant were both eighteen years old. The defendant and other guests at the party were drinking, and the victim became intoxicated and also distraught over her relationship with her boy friend. The defendant offered to take the victim to see her boy friend, and the two left together at approximately 11:30 P.M.

Adalberto Ingles,[3] one of the men at the party, followed the victim and the defendant on a bicycle and joined them as they

_____

[2]The defendant was tried on theories of deliberate premeditation, extreme atrocity or cruelty, and felony-murder; the jury found him guilty only under the felony-murder theory, with aggravated rape as the felony. The trial judge subsequently dismissed the indictment charging aggravated rape.

This was the second trial for the defendant on these charges. The defendant's first trial, which occurred in March, 2006, ended in a mistrial when the jury were unable to reach a verdict.

[3]Adalberto Ingles was initially a codefendant, but the cases were severed

arrived at a park near the Chelsea Soldiers' Home. Sometime after the three entered the park, the victim walked down a hillside into a wooded area in order to urinate, and the defendant followed her. Hearing screams, Ingles also descended, and saw the defendant lying on top of the victim on the ground. At the defendant's direction, Ingles removed the victim's pants while the defendant held her, and Ingles held the struggling victim down as the defendant had vaginal intercourse with her. The defendant then stated that he and Ingles had to kill the victim. The defendant picked up a large rock, which he and Ingles separately used to hit the victim on the head. At that point the victim was bleeding from her head and not making any sound, but was still breathing faintly. The two men left the victim and returned to the rear porch of the earlier party site at 115 Washington Avenue. They borrowed a blanket or sheet from one of the apartment's residents, went back to where they had left the victim, threw the blanket over her, and set fire to it, burning the victim's body.[4] The next morning, Marisol Cruzado, another resident of the apartment at 115 Washington Avenue, overheard the defendant state that he had had sex with the victim.

The victim died of blunt head trauma and thermal injuries. The medical examiner found no evidence of trauma that might be related to sexual assault. An anorectal swabbing from the victim, blood from a large rock found at the scene, and a cutting from the victim's jeans were all tested for deoxyribonucleic

and Ingles subsequently pleaded guilty to murder in the second degree and aggravated rape. Ingles testified at the defendant's second trial pursuant to a plea agreement with the Commonwealth. We discuss that plea agreement in Part 4, *infra*.

[4]Testimony at trial as to these events in the wooded area came from Ingles. The defendant gave a statement to police at approximately 3 A.M. on July 24, 2002, that conflicted with Ingles's version but did place both men at the scene of the crime. In the statement, an audiotape recording of which was admitted at trial, the defendant said that Ingles first followed the victim down the hill, and that the defendant followed them; Ingles forced the defendant to remove the victim's pants; and Ingles raped the victim. According to the statement, Ingles demanded the defendant rape the victim and he pushed the defendant on top of her, causing the defendant to scrape his knees. The defendant claims in the statement that he pretended to rape the victim, after which Ingles stabbed him in the leg, forced him to hit the victim with the rock, and then set the victim on fire. The defendant challenges the admissibility of his statement, and we discuss it in more detail in connection with our consideration of his arguments.

acid (DNA) and the victim was a match for all three. The defendant was excluded as a match for DNA from the first two items, while testing of a minor DNA profile in the jeans sample was inconclusive.

2. *Admission of the defendant's statement.* The defendant claims that the admission at trial of his second statement to the police was error on two grounds, each of which requires reversal of his conviction and a new trial. In particular, he argues that neither the waiver of his Miranda rights nor the second statement itself was voluntary, and therefore should have been suppressed; and that in any event the statement should have been suppressed under *Commonwealth* v. *Rosario*, 422 Mass. 48, 56-57 (1996) (*Rosario*), because he gave it more than six hours after his effective arrest and without waiving his right to prompt arraignment.

Before trial, the defendant moved to suppress the statement on the first ground now asserted, that is, the lack of voluntariness. An evidentiary hearing on the motion was held before a Superior Court judge who was not the trial judge (motion judge). The motion judge denied the motion in a written memorandum of decision and order on November 17, 2005.[5] The motion to suppress did not raise any argument concerning a violation of *Rosario*. Nevertheless, the evidence presented at the motion hearing and the motion judge's findings, which constitute the factual basis for considering the defendant's arguments on voluntariness, also provide many of the record facts relevant to his *Rosario* claim. We begin with a summary of the motion judge's findings, supplemented by uncontroverted evidence presented at the motion hearing.[6]

a. *Additional facts.* Around 8 or 9 P.M. on the evening of July 23, 2002, approximately one week after the victim was killed, State Troopers Romere Antoine and John Sylva approached the

[5]Immediately before his second trial in January, 2007, the defendant moved for reconsideration of the denial of his motion to suppress. The trial judge denied the motion to reconsider, as did the motion judge, to whom the motion also had been referred.

[6]At trial, witness testimony was presented and exhibits were introduced that are pertinent to both the defendant's challenges to the admission of his statement on appeal. There are no material differences between the trial testimony and testimony provided at the motion hearing on these issues, and the exhibits were the same.

defendant on Washington Avenue in Chelsea. The troopers had received information that a man known as "Pinocchio" knew the victim and was the last person seen with her. On spotting a man fitting the description they had been given, the officers got out of their unmarked cruiser and the defendant identified himself as Pinocchio. The troopers told the defendant that they wanted to speak with him regarding the homicide of Monica Mejia, and asked if he would mind accompanying them to the Chelsea police station to answer a few questions. The defendant, who is Spanish speaking, was able to comprehend the troopers' request although it was made in English and, speaking in broken English himself, agreed to go with them. The troopers and the defendant traveled the short distance to the police station in the unmarked cruiser. Both troopers rode in the front while the defendant rode in the back. The defendant was not handcuffed or under any restraint.

On arrival at the police station, the two troopers and the defendant entered through the front entrance and proceeded to a fourth-floor conference room. The room, also referred to as the library, contained a long conference table, chairs, bookcases, and a television. The entrance to the room was a glass doorway in a glass wall, which permitted viewing by people outside the room. The defendant sat unrestrained in the room. Trooper Sylva attempted to read the defendant his Miranda rights in English, but decided it would be better to obtain the assistance of a Spanish-speaking officer. Sergeant Peter Perez of the State police was called and arrived ten minutes later. On entering the library, Perez introduced himself and determined the defendant spoke Spanish.

Perez handed the defendant a preprinted Chelsea police department Miranda rights explanation and waiver form written in Spanish, and read the entire form to him. Perez asked if the defendant had any questions about the form, offering to explain, but the defendant had no questions. The defendant checked "Si" (yes) to two questions at the bottom of the form that asked, respectively, in Spanish, "Do you understand what I have said to you?" and, "Having these rights before you, do you wish to voluntarily, consciously, and intelligently give up your rights and respond to any question or make any declaration right now?" The defendant signed the form with the name

"Melvin Omar Lionso" and Trooper Sylva also signed it. The form was dated July 23, 2002, at 9:15 P.M.[7]

After the defendant signed the Miranda form, his first interview by the police began. Present were Sylva, Sergeant Detective Edward Conley of the Chelsea police department, and other Chelsea police officers who were present intermittently. Perez initially interpreted but was soon replaced by a Spanish-speaking Chelsea police officer, Detective Rosalba Medina. During the interview, the defendant acknowledged that he knew the victim and had heard of her death. He initially stated that he had last seen the victim two days before she was killed. He also explained that the victim was a friend of his sister and had come to his birthday party, and stated that he had developed feelings for her. When the officers asked about his presence at 115 Washington Avenue, the defendant replied that he had been there about six months earlier. As for the night in question, the defendant stated that he was at a residence at 100 Washington Avenue drinking with a friend.

Trooper Sylva had noticed that the defendant was limping, and Conley asked the defendant to lift his pant legs.[8] The defendant did so, revealing one bad laceration and several other scrapes, along with bruising and red marks over much of his legs. The defendant granted Conley's request to take a photograph of his legs. This occurred approximately forty-five minutes to one hour after the beginning of the interview, between 10 P.M. and 10:15 P.M. A police witness testified that as of about this time, in light of inconsistencies between the defendant's statements and information the police had gleaned from other interviews, the police would not have permitted the defendant to leave the police station.

The interview continued a little while longer, and the defendant at one point exclaimed that he had been in love with the

[7]Given that the Miranda waiver form reflected the time of 9:15 P.M., and the evidence that after beginning to administer the Miranda rights in English, Trooper Sylva waited about ten minutes for the arrival of Sergeant Perez, we infer that the defendant and the interrogating police officers initiated their conversation in the neighborhood of 9 P.M.

[8]Conley sought to corroborate a statement of another witness that the defendant appeared to be injured when he returned to the apartment at 115 Washington Avenue on the night of the murder.

victim. The statement struck the officers as odd, given the context of the interview, the "matter of fact" tone the defendant used, and the fact that the defendant had previously indicated he had tried to have some sort of relationship with the victim, but "nothing ever happened." Following this first interview, at approximately 10:30 or 10:45 P.M., police officers involved in the investigation met outside the library to discuss the defendant's answers and the status of the investigation.

Meanwhile, personnel from the crime scene services unit of the State police arrived to examine and photograph the defendant. Detective Medina, still performing the role of interpreter, accompanied the defendant to the detective bureau on the third floor of the station for examination by crime scene technicians. At or around this time, Medina read the defendant a Spanish-language form, known as a register of consignment, authorizing the police to take certain items and samples from the defendant for analysis.[9] The defendant signed the form, as did Trooper Sylva, both in the presence of Officer Medina.

After this examination, at about 2 A.M., police began a second interview with the defendant in an interview room on the third floor. The interview room was approximately eight feet by eight feet, and featured a small, round table with chairs, a two-way mirror, and a recording device. The defendant was joined by Sylva, Conley, and Medina, again serving as interpreter. About twenty minutes into this second interview, at around 2:20 A.M., the defendant gave a statement placing himself at the scene of the crime and implicating himself as well as Ingles in its commission. The defendant's statement was eventually tape recorded beginning at 3 A.M. and ending at 3:22 A.M.[10]

While the defendant was at the Chelsea police station, he never once asked to leave, and gave no indication that he did not wish to speak or cooperate with the police. The defendant

___

[9]Testimony at trial indicated that the defendant consented to the taking of his shoes as well as his fingerprints, and a blood sample by crime scene services personnel. Trial testimony varied from testimony at the motion hearing with respect to the exact time the defendant signed the form, but the time of his signature is not germane to our analysis of the defendant's claims.

[10]As previously indicated (see note 4, *supra*), the defendant's statement described his participation in the sexual assault and burning of the victim, but in the defendant's version, the defendant was forced to act by Ingles.

generally appeared carefree and calm throughout his time at the Chelsea police station, and did not appear to be intoxicated or under the influence of alcohol or drugs. Only when the defendant described his own role in the homicide did officers observe him become slightly agitated or excited.

Based on the evidence she deemed credible, the motion judge found beyond a reasonable doubt that all the defendant's statements "were made knowingly, willingly and voluntarily."

b. *Voluntariness of the defendant's waiver of Miranda rights and of his second statement.* The defendant contends that, contrary to the motion judge's ruling, he did not knowingly and voluntarily waive his Miranda rights, and his tape-recorded second statement to the police was involuntary. "In reviewing a judge's determination regarding a knowing waiver of Miranda rights and voluntariness, we 'grant substantial deference to the judge's ultimate conclusions and we will not reject a judge's subsidiary findings if they are warranted by the evidence.' . . . However, we will make an independent inquiry 'to ascertain whether the judge properly applied the law in a given case.' " (Citations omitted.) *Commonwealth* v. *Mandile*, 397 Mass. 410, 412-413 (1986) (*Mandile*), quoting *Commonwealth* v. *Benoit*, 389 Mass. 411, 419 (1983). The questions we must answer are: "(1) whether there has been a knowing and intelligent waiver of the Miranda requirements; and (2) whether, in the totality of the circumstances, the [statements] given were the product of a free will, and not the result of coercion or intimidation." *Commonwealth* v. *Mello*, 420 Mass. 375, 383 (1995) (*Mello*), citing *Commonwealth* v. *Parham*, 390 Mass. 833, 838 (1984).

With respect to the Miranda waiver, the defendant takes no issue with the motion judge's determination that Sergeant Perez provided a full description of the Miranda rights or, apparently, with her implicit conclusion that the defendant waived them voluntarily, knowingly and intelligently when he was informed of those rights at 9:15 P.M. on July 23, 2002. The defendant's claim is rather that when he gave his second statement around 3 A.M. on July 24, he had been "held" for more than six hours at the police station, had not had any sleep, and had already incriminated himself in his first statement; and that at the beginning of his second interview, the police confronted him that his earlier

statement was not true. These circumstances, the defendant argues, vitiated the effectiveness of his original Miranda waiver and required the police to administer Miranda warnings again for any waiver to be valid at the time of his second statement.

"In determining whether a waiver was made voluntarily, the court must examine the totality of the circumstances surrounding the making of the waiver." *Commonwealth* v. *Edwards*, 420 Mass. 666, 670 (1995), citing *Commonwealth* v. *Medeiros*, 395 Mass. 336, 345 (1985). The court may look at such factors as "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, [and] physical and mental condition." *Mandile*, 397 Mass. at 413.

We have recognized that Miranda warnings, once given, are not effective in perpetuity. *Commonwealth* v. *Cruz*, 373 Mass. 676, 687 (1977), quoting *United States* v. *Hopkins*, 433 F.2d 1041, 1045 (5th Cir. 1970), cert. denied, 401 U.S. 1013 (1971). However, "there is no requirement that an accused be continually reminded of his rights once he has intelligently waived them." *Mello*, 420 Mass. at 386, quoting *Biddy* v. *Diamond*, 516 F.2d 118, 122 (5th Cir. 1975), cert. denied, 425 U.S. 950 (1976). The principal inquiry remains whether the defendant, "with a full knowledge of his legal rights, knowingly and intelligently relinquish[ed] them." *Commonwealth* v. *Cruz, supra*, quoting *Miller* v. *United States*, 396 F.2d 492, 496 (8th Cir. 1968), cert. denied, 393 U.S. 1031 (1969). In *Mello*, we held that the passage of nearly six hours between the giving of Miranda warnings and the defendant's challenged statement did not necessitate fresh Miranda warnings. *Id.* at 386-387. The defendant in that case, like the defendant here, did not request an attorney or exercise his right to remain silent at any point in the hours between statements. *Id.* at 386. And as in this case, there was ample evidence that the defendant fully understood his Miranda rights and made a knowing, intelligent, and voluntary waiver of them. *Id.*

Citing *Mello*, the defendant acknowledges that the passage of six hours after Miranda warnings were first given would not alone require a second administration of the warnings. He argues, however, that the other circumstances he points to made new Miranda warnings necessary, such as the fact that he had been

at the police station for many hours without sleep and that by 3 A.M., he had made statements that the police knew were false and about which they had confronted him. We disagree. If the making of false or incriminating statements and being confronted by them were to undermine and render ineffective an otherwise valid Miranda waiver, police would be obliged to repeat Miranda warnings whenever a defendant in an interrogation moves toward inculpating himself. This is not the law. Moreover, the record reflects no evidence of "unfair techniques or tactics" on the part of police that could be said to subvert the validity of the waiver. *Commonwealth* v. *Williams*, 388 Mass. 846, 853 (1983), citing *Commonwealth* v. *Silva*, 388 Mass. 495, 503 (1983). In sum, while six hours between the administration of Miranda warnings and a defendant's statement is certainly a lengthy period, on the record before us, we find no error in the motion judge's conclusion that the defendant's waiver of his Miranda rights in relation to his second statement was voluntary, knowing, intelligent, and therefore valid.

We turn to the voluntariness of the defendant's second statement itself, a distinct question from the validity of the Miranda waiver. *Commonwealth* v. *Leahy*, 445 Mass. 481, 486-487 (2005), citing *Commonwealth* v. *Magee*, 423 Mass. 381, 387-388 (1996) ("Due process requires a separate inquiry into the voluntariness of a statement, apart from the Miranda waiver"). A court must determine whether the statement was made freely and voluntarily given the totality of the circumstances in which it was made, "to ensure that the defendant's confession . . . was not the product of inquisitorial activity which had overborne his will." *Commonwealth* v. *Magee*, *supra* at 388, quoting *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976). As with the determination of voluntariness of a Miranda waiver, the court may consider a variety of factors, including a defendant's age, experience with the criminal justice system, educational level, and mental status, among others. *Commonwealth* v. *Anderson*, 445 Mass. 195, 203 (2005), citing *Commonwealth* v. *Magee*, *supra* at 388. The finding of voluntariness, if made, "must appear from the record with unmistakable clarity." *Commonwealth* v. *Tavares*, 385 Mass. 140, 152, cert. denied, 457 U.S. 1137 (1982), quoting *Sims* v. *Georgia*, 385 U.S. 538, 544 (1967).

The defendant argues that because he was young, came from El Salvador, spoke limited English, was alone at the police station, and was kept awake through the early morning hours, his second statement was involuntarily made. The findings of the motion judge, however, included determinations that the defendant was questioned in Spanish, his native language; he was not restrained; he was coherent; he did not appear to be under the influence of either drugs or alcohol, or stress; and he never indicated he wanted to end the interview or stop cooperating with the police. These findings support the judge's ultimate conclusion that the defendant's statements, including his second, were voluntarily made, and weigh against a conclusion that the defendant's "will was overborne to the extent that [his] statements were not the result of a free and voluntary act." *Commonwealth* v. *Sneed*, 440 Mass. 216, 222 (2003), citing *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995). There was no error in the denial of the defendant's motion to suppress and subsequent admission of his second statement at trial.

c. *Prompt arraignment.* The defendant also claims on appeal that his recorded statement should have been suppressed because he made the statement more than six hours after he was effectively under arrest.[11] Police are required to bring an arrested individual before a court for arraignment as soon as is reasonably possible. See Mass. R. Crim. P. 7 (a) (1), as amended, 397 Mass. 1226 (1986). In *Rosario*, 422 Mass. at 56, this court announced a bright-line rule creating a safe harbor for the interrogation of arrested individuals prior to arraignment: "An otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest . . . ." Conversely, unless there is a waiver of prompt arraignment or an exception based on the incapacity of the person, a natural disaster, or an emergency, a statement taken outside of the safe harbor period is inadmissible. *Id.* at 56-57.

The six-hour safe harbor period announced in *Rosario* commences when a defendant is arrested. *Id.* at 56. "An arrest occurs

[11]As noted, the defendant did not include any claim in his motion to suppress that his right to prompt arraignment had been violated and suppression of his statement was required under *Commonwealth* v. *Rosario*, 422 Mass. 48, 56-57 (1996) (*Rosario*), and the motion judge therefore did not address the issue.

where there is [1] 'an actual or constructive seizure or detention of the person, [2] performed with the intention to effect an arrest and [3] so understood by the person detained.' " *Commonwealth* v. *Grandison*, 433 Mass. 135, 145 (2001), quoting *Commonwealth* v. *Cook*, 419 Mass. 192, 198 (1994). Under art. 14 of the Massachusetts Declaration of Rights and the Federal Constitution, the first requirement of arrest, seizure, depends on "[w]hether, in view of all the surrounding circumstances, a reasonable person would have believed he was not free to leave." *Commonwealth* v. *Cook*, *supra* at 199, and cases cited.[12]

By definition, a person not seized has not been arrested. See *Commonwealth* v. *Cook*, *supra* at 198. Accordingly, the contours of what constitutes a seizure are relevant to the determination of an arrest. A person who goes voluntarily to the police station for questioning is not necessarily seized at that point. See, e.g., *Commonwealth* v. *Jackson*, 447 Mass. 603, 611 & 613-614 (2006) (suspect who "went to the police station voluntarily" not seized until formal arrest six hours later). Similarly, the reading of the Miranda rights does not automatically demonstrate seizure. See *id.* at 605. Even a request from the police that a defendant remain available at the police station may not constitute seizure where there "was no submission to authority or physical force following a show of authority nor would a reasonable person have felt he was not free to leave the police station." *Commonwealth* v. *Cook*, 419 Mass. at 199 (defendant not seized when police officer patted him down in police station and requested he "have a seat in the lobby").

The defendant's challenged statement began about 3 A.M. and was completed at 3:22 A.M. on July 24, 2002. For purposes of the *Rosario* safe harbor rule, therefore, the critical question is whether the defendant was under arrest six hours before giving

---

[12]Custody closely resembles the "seizure" prong of arrest. To find custodial interrogation, a court must "determine from the perspective of a reasonable person in the suspect's shoes whether there was . . . a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest [plus interrogation]." *Commonwealth* v. *Morse*, 427 Mass. 117, 123 (1998) (*Morse*), quoting *United States* v. *Ventura*, 85 F.3d 708, 712 (1st Cir. 1996). The determination of custody depends in part on whether the suspect "was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave." *Morse*, *supra* at 121 n.4, quoting *Commonwealth* v. *Bryant*, 390 Mass. 729, 737 (1984).

that statement, that is, before 9:22 P.M. The defendant had gone willingly to the station when officers asked him to do so; the motion judge specifically found that he was not in custody at that time. He was brought to a fourth-floor library or conference room with windows overlooking a park, where he sat without handcuffs or other restraint. According to the police, he was just one of several persons being interviewed that afternoon and evening in connection with the murder. At approximately 9:15 P.M., before the police began asking any substantive questions, he was given his Miranda warnings, which, as just stated, is not necessarily a signal of custody or seizure. See *Commonwealth* v. *Jackson*, 447 Mass. at 605. The subject matter of the interview that followed was initially general rather than accusatory, starting with whether he knew the victim and when he had last seen her; no one communicated to the defendant that he was a suspect.[13] Cf. *Commonwealth* v. *Groome*, 435 Mass. 201, 212 (2001) (defendant was not in custody where police officers "did nothing to communicate to the defendant any impression that he was a suspect in any crime, but merely that there were officers who wanted to talk to him about a missing vehicle").

These facts, not disputed by the defendant, clearly demonstrate that the defendant was not seized and was therefore not under arrest before 9:22 P.M. on July 23.[14] During this time, a reasonable person would have felt free to end the interview and leave the police station.[15] The defendant's recorded statement fit within

---

[13]Trooper Sylva testified at the suppression hearing that the defendant was not a suspect when the interview began.

[14]Sergeant Perez testified that he thought the defendant was not free to leave the police station even at the time of Perez's arrival, based on the information he stated he had received from other officers to the effect that the defendant was a homicide suspect, and in custody. However, Perez himself was not involved in the investigation of the victim's murder or in the interrogation except for the brief period that he was serving as interpreter. The officers who were conducting the interview of the defendant did not think the defendant was in custody during his first interview, or at least until close to the end, when the defendant made statements that appeared to conflict with information the officers had and when he showed them the cuts on his leg. Furthermore, the subjective view of an officer does not determine whether a person is in custody or under arrest; what matters are the objective circumstances. See *Commonwealth* v. *Obershaw*, 435 Mass. 794, 802 (2002), quoting *Morse*, 427 Mass. at 124.

[15]Because the defendant was not under arrest six or more hours before his

the six-hour safe harbor established by *Rosario*. There was no error in its admission.

3. *Use of the defendant's nickname "Pinocchio."* The defendant asserts the trial judge erred in permitting the prosecutor and witnesses to make repeated references to his nickname, "Pinocchio," at trial. He filed a motion in limine before trial to prevent any references to the nickname, which the judge denied. Accordingly, we review the claim to determine whether prejudicial error occurred. See *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

There was no error. We recognize that references to a defendant's alias (or nickname) by the prosecution can be prejudicial because "[a]liases can be suggestive of bad character and prior criminality, and therefore raise a possibility that the jury will improperly consider criminal propensity." *Commonwealth* v. *Carter*, 423 Mass. 506, 514-515 (1996) (prosecution's repeated use of defendant's alias, "Kilo," in murder case where drug dealing was at issue was improper, but in light of other evidence did not require reversal of defendant's conviction). See *Commonwealth* v. *Martin*, 442 Mass. 1002, 1003 (2004) (prosecution's repeated, gratuitous use of defendant's alias, including comment in closing argument, "How can you trust somebody who has two names at the outset?" was improper and required reversal of defendant's conviction). But a prosecutor may refer to, or ask witnesses about, a defendant's nickname or alias when there is a reason to do so. See, e.g., *Commonwealth* v. *Manning*, 44 Mass. App. Ct. 695, 705-706 (1998) (references by witnesses to aliases

---

recorded statement, there is no need to determine whether the arrest should be deemed to have occurred before he was formally placed under arrest at the conclusion of his statement, around 3:30 A.M. on July 24. Nevertheless, based on our review of the record, it appears that the earliest point for deeming him under arrest in relation to the safe harbor rule of *Rosario*, 422 Mass. at 56-57, would be somewhere between 10 P.M. and 10:45 P.M. At around 10 or 10:15 P.M., near the conclusion of his first interview, he showed police his leg; 10:45 P.M. corresponds to the meeting outside the conference room among police officers involved in the murder investigation. Around the end of the first interview, it appears that, in the words of Sergeant Conley, one of the interrogating officers, the defendant's "status" changed on account of his inconsistent statements and the injuries on his legs. He was not free to leave the police station, and he essentially was turned over to the custody and supervision of crime scene services personnel for additional photographing, testing, and the provision of clothing items.

defendant had used in past was relevant to identification of defendant as shooter, and therefore properly permitted).

The defendant argues here that because the story of the fairy tale character Pinocchio is well known, jurors would understand the nickname to signify that the defendant had a propensity to lie, with prejudice to him as a result, and the prosecutor had no need to refer, or ask witnesses about, the nickname. We disagree. In the circumstances of this case, the defendant's nickname was relevant to identity. The defendant's accomplice Ingles and three of the witnesses who had seen the defendant and the victim at the party in Chelsea on the night she was killed testified that Pinocchio was the name by which they knew the defendant. Troopers Sylva and Antoine, the two State police officers who brought the defendant to the police station on July 23, 2002, were told to look for a man called Pinocchio, and when they approached the defendant, he told them that was his name. The prosecutor's references to the nickname were confined to a few identity-related questions he posed to these witnesses, and he did not mention the nickname Pinocchio in his opening statement or closing argument. Contrast *Commonwealth* v. *Martin*, 442 Mass. at 1003. Moreover, we agree with the trial judge that the risk was slim that jurors would infer from the defendant's nickname that he was a person with a propensity to lie, rather than taking the name as perhaps a reference to the defendant's appearance.[16]

In sum, we find no abuse of discretion or other error in the judge's refusal to bar the use of the defendant's nickname at trial.

4. *Ingles's plea agreement.* The defendant argues that the prosecutor impliedly and improperly vouched for the credibility and truthfulness of Ingles, who testified pursuant to a plea agreement with the Commonwealth. See note 3, *supra*. The claim is that on redirect examination, the prosecutor asked repeated questions of Ingles about his obligation under the plea agreement to testify truthfully, even though defense counsel had not opened the door to this line of inquiry during cross-examination. This questioning was not proper, in the defendant's view, and requires reversal

---

[16]The judge also declined to instruct the jury concerning the use of the nickname as part of his final charge, stating that by doing so he was more likely to draw unfavorable attention to its use than if he said nothing. Defense counsel agreed.

of his convictions because its admission constitutes prejudicial error.[17] The argument fails.

Under the procedures set out in *Commonwealth* v. *Ciampa,* 406 Mass. 257 (1989), to assist trial judges (and counsel) in dealing with witnesses who testify pursuant to a plea agreement, it is permissible for the prosecution to question the witness about his obligation under the agreement to testify truthfully. Such questioning, however, is limited to redirect examination, and is permissible only when "on cross-examination the defendant has attacked the witness's credibility based on his incentive to testify in a manner helpful to the government's case." *Commonwealth* v. *Rivera,* 430 Mass. 91, 96 (1999), quoting *Commonwealth* v. *Ciampa, supra* at 264. The prosecutor followed this course in the present case. On direct examination, Ingles testified without objection concerning the general terms of his plea agreement, including the fact that under the agreement, he agreed to testify against the defendant, he had pleaded guilty to murder in the second degree and aggravated rape, and had received a life sentence with the possibility of parole after fifteen years on the murder charge followed by a sentence of from ten to fifteen years on the aggravated rape charge. He did not mention the agreement's provision that he testify truthfully. On cross-examination, defense counsel asked Ingles whether he was aware that after he testified for the Commonwealth against the defendant, the prosecutors could come to court and obtain for him a revised (and implicitly more favorable) sentence. Ingles answered yes. After that exchange, on redirect examination, the prosecutor asked whether Ingles understood that under the agreement he was required to testify truthfully.

Contrary to the defendant's contention on appeal, the inquiry by the defendant's trial counsel about the possibility of a revised sentence did serve to suggest that the defendant knew he could receive a better disposition of the case by testifying in a way that was favorable to the government. This is the stuff of impeachment.[18] There was no error in permitting the prosecutor in

[17]We consider the defendant to have preserved his objection to the prosecutor's questioning about the obligation to testify truthfully because he objected to the prosecutor's first question on the subject during redirect examination.

[18]That the defendant's counsel was attacking the credibility of Ingles on the grounds that he had entered into a plea agreement is borne out by the defense's

response to touch on the defendant's obligation to testify truthfully. See *Commonwealth* v. *Ciampa*, 406 Mass. at 264. Moreover, the prosecutor's questions must be viewed in the context of what followed. The prosecutor did not mention Ingles's obligation to testify truthfully or indeed his plea agreement at all in his closing argument (as he had not in his opening statement). And in his final charge to the jury, the judge, following the advice of the *Ciampa* case very closely, gave a specific and forceful cautionary instruction about the need to examine the testimony of a witness testifying under a plea agreement with "extra care and caution." The judge also instructed that deciding whether Ingles was telling the truth was for the jury to decide; the reference to truthfulness in the agreement did "not mean that the government has any way of knowing whether the witness is telling the truth"; and the jury was not to consider Ingles's willingness to plead guilty "as any evidence whatsoever of the defendant's guilt in this case." See *Commonwealth* v. *Ciampa*, 406 Mass. at 263-264, 266. There was no error.

5. *The jury's observation of the memorial to the victim.* The defendant argues that jurors were subject to extraneous influence requiring reversal because, during the view they took of the crime scene, they saw a small memorial apparently erected in the victim's memory. "Where a party seeks a mistrial in response to the jury's exposure to inadmissible evidence, the judge may 'correctly rel[y] on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant.' " *Commonwealth* v. *Kilburn*, 426 Mass. 31, 37-38 (1997), quoting *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989). Where a judge gives adequate curative instructions, jurors' observations of a memorial do not necessarily require a new trial. See *Commonwealth* v. *Douglas*, 75 Mass. App. Ct. 643, 654 n.14 (2009) (in motor vehicle homicide case, "[n]o evidence support[ed] the view that . . . the accident site memorial overcame the judge's instructions for a verdict based strictly on the

closing argument. Defense counsel stated: "Ingles has pleaded guilty to these crimes. But, when he pleaded guilty, he did so conditionally. He entered into a pact with the prosecution, you testify against Melvin Martinez or we revoke the deal and we try you for first-degree murder. Ingles knows that if he doesn't testify the way the government wants him, the rug is pulled out from under him. True incentive to do as you're told."

evidence"). Cf. *Commonwealth* v. *Diaz*, 448 Mass. 286, 291 (2007) (defense counsel's actions in pointing out memorial to jurors not ineffective assistance of counsel).

We find no error in the denial of a motion for a mistrial on the basis of extraneous influence on the jury. The record is unclear on how closely the jurors had observed the memorial, and the judge's instruction about the memorial as part of his final charge cured any possible prejudice. The judge instructed the jury that the view is not evidence, that the memorial "has nothing to do with the case," and that, while sympathy for a victim is natural, "you can't base any verdicts on sympathy." He emphasized to the jury that the memorial "plays no role in your decision." We find any possible extraneous influence of the memorial on the jury was properly cured, and the judge did not abuse his discretion in denying the motion for a mistrial.

6. *Review under G. L. c. 278, § 33E.* We have reviewed carefully the entire trial record pursuant to our obligation under G. L. c. 278, § 33E, and discern no reason to reduce the jury's verdict or to grant a new trial.

*Judgment affirmed.*