NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

13-P-1432                                        Appeals Court

COMMONWEALTH  vs.  SANTIAGO NAVARRO.

No. 13-P-1432.

Essex.     October 1, 2014. - December 30, 2014.

Present: Berry, Hanlon, & Carhart, JJ.


Robbery. Home Invasion. Kidnapping. Practice, Criminal,
    Assistance of counsel, Identification of defendant in
    courtroom, Instructions to jury, Argument by prosecutor.
    Constitutional Law, Assistance of counsel, Identification.
    Evidence, Identification, Photograph, Argument by
    prosecutor, Rebuttal, Firearm. Firearms.



    Indictments found and returned in the Superior Court
Department on July 2, 2010.

    The cases were tried before Douglas H. Wilkins, J.


    Elizabeth A. Billowitz for the defendant.
    Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.


    BERRY, J.  After a jury trial in Superior Court, the

defendant was convicted on ten counts each of armed robbery

while masked, G. L. c. 265, § 17; home invasion, G. L. c. 265,

§ 18C; and kidnapping, G. L. c. 265, § 26.  On appeal, he argues

that (1) the judge erred in not -- sua sponte, and without a defense request -- giving the five factors concerning eye witness identifications set forth in Commonwealth v. Rodriguez, 378 Mass. 296 (1979) (Rodriguez); (2) his trial attorney's failure to request such a full Rodriguez instruction constituted ineffective assistance; (3) the Commonwealth failed to produce a report concerning a photographic (photo) array in which an accomplice to the robbery identified the defendant, notwithstanding the Commonwealth's representation that no such report exists; (4) it was error for the prosecutor to use, without objection, the defendant's nickname "Raw" in examination of an accomplice witness who used that nickname to refer to the defendant and in closing when referring to that witness's testimony; and (5) it was improper to allow the accomplice witness to testify that, prior to the robbery, he had seen the defendant at a barbershop with a MAC-11 and a sawed-off shotgun, even though defense counsel voiced no objection and had elected to inform the jury in his opening statement that no such weapons were found in a search of the barbershop. We affirm.

1. Background. The following is a summary of the trial evidence. On June 13, 2010, Gary Leger held one of his regular high stakes poker game at his apartment in North Andover. The game started between 8 and 10 P.M., with four to six card players, and later grew to ten players. Christopher "Shorty"

Maldonado arrived while the game was in progress. (As shall be seen in further disclosure of the facts, Shorty was an accomplice with the defendant in the planning, and actual robbery, of the poker game.)

Around 2:21 A.M., two masked men, their faces mostly hidden by some combination of masks, bandanas, hoods, kerchiefs, ski masks, hats, or caps, came through the back door. One of the intruders, later identified as the defendant, held what Shorty later described to the police as a .380 caliber semiautomatic handgun. The defendant ordered the players around the table to place their cellular telephones (cell phones) and hands on the table, while the other masked man went around the table collecting cash and cell phones and tied up all the players' hands with zip ties. The second masked man also took $2,000 from the "bank" held by Leger. To make it appear that Shorty was also a victim in the robbery, Shorty's hands were bound with a zip tie, but the tie was left loose.

Shorty freed himself from his loosely tied zip tie while the robbery was in progress. At that point, Shorty stood up, took the handgun from the defendant, and stated to all the card players present, "Yeah, it was me. I did it. I set it up." The robbery lasted approximately thirty to forty minutes. The defendant, Shorty, and the second masked man left via the backdoor.

One player, Joel Marelis, testified at trial that he and another player, Daniel Ferreras, were able to free themselves from their zip ties, looked out the window, and saw the robbers, including Shorty, get into a dark blue Mitsubishi with the license plate number 7777-MF or 777-MF. Both men got into Ferreras's vehicle and followed the robbers for a few minutes, but stopped when the Mitsubishi took the entrance ramp onto Route 495. Soon afterwards, the two men reported to a North Andover police officer that the vehicle used as the getaway car was a blue Mitsubishi Galant, license plate number 7777 MF.

At 2:58 A.M., the police determined that the Mitsubishi was registered to a Milagros Fernandez, who was later identified as the defendant's girl friend. The day after the robbery, the defendant accompanied Fernandez to the North Andover police station. The two were driving a dark blue Mitsubishi, license plate number 7777-MF -- matching the description of the getaway car. The pair requested to speak with Detective Daniel Cronin. Fernandez gave Detective Cronin her Massachusetts driver's license. The defendant, who referred to Fernandez as "his girl," produced a business card from Prudential Real Estate with his photograph and name, Santiago Navarro, appearing thereon.

On June 14, 2010, Detective Cronin arranged a photo array that included Shorty. Nine out of the ten players identified Shorty as the inside man. Three days later, on June 17,

Detective Cronin put together another array that included a photograph of the defendant.  Only two players, Leger (the game organizer) and Marelis (one of the players who had followed the robbers in the Mitsubishi) were able to identify the defendant. Both men told the detective that their degree of certainty was eight out of ten.

2.  The identification instructions.  On the fourth day of trial, the judge asked counsel to provide him with proposed jury instructions.  Defense counsel did not do so.  Notwithstanding the lack of such a request, the judge did give eye witness instructions to the jury.[1]

_____

[1] In his jury charge the judge first highlighted identification as a central contested issue stating as follows:

> "Now, one of the most important issues in this case is the identification of the defendant as the alleged perpetrator of the crime."

The judge then instructed the jury on the potential for honest good-faith mistaken identifications as set forth in Commonwealth v. Pressley, 390 Mass. 617, 620 (1983).

> "Now, in addition[,] in deciding whether or not to believe a witness who identifies the defendant as the perpetrator, remember that you must consider not only whether the witness is trying to tell the truth or is lying, you must also consider whether that witness's testimony is accurate or instead is an honest mistake. Sometimes people perceive an event erroneously or forget things or become confused.

> "In deciding whether a witness is trying to be truthful is only the first step.  You must then go on to decide whether the witness's testimony on this issue is accurate in fact."

Next, the judge emphasized that the identification burden of proof rests with the Commonwealth.

"Now, I once again emphasize that the burden of proof that's on the prosecutor extends to every element of the crimes charged, and this specifically includes the burden of proving beyond a reasonable doubt the identity of the defendant as the perpetrator of the crimes for which he stands charged.

"If, after examining the testimony, you have a reasonable doubt as to the accuracy of the identification, you must find the defendant not guilty. In deciding whether or not to believe a witness who identifies the defendant as the perpetrator, remember that you must not only consider whether the witness is trying to tell you the truth or is lying, you must also decide whether that witness's identification is accurate or instead may well have been an honest good-faith identification that nonetheless may have been mistaken."

The essence of the above identification instruction, in accord with Pressley, emphasized the potential for honest good-faith mistaken identifications and that the Commonwealth's burden of proof extended to proving identification beyond a reasonable doubt. These considerations are very close to the factors set forth in Rodriguez. Indeed, as the Supreme Judicial Court has noted, the identification instruction approved in Pressley "simply identifies more specifically what is intended by the Rodriguez instruction." Commonwealth v. Pires, 453 Mass. 66, 71 (2009).

In his credibility instructions, the judge essentially told the jurors to ponder whether the witnesses had the opportunity to see the events and then accurately describe them.

"Did the witness appear to know what the witness was talking about, what was the opportunity or lack of opportunity that the witness had to see and learn the facts about which he or she was testifying?

"What was the ability of the witness to understand, to recall and to accurately describe those things that a witness was testifying to?"

The predicate instruction for all of the identification factors set forth in Rodriguez originates with a request thereof. "Fairness to a defendant compels the trial judge to give an instruction on the possibility of an honest but mistaken identification when the facts permit it and when the defendant requests it" (emphasis added). Commonwealth v. Caparrotta, 34 Mass. App. Ct. 473, 476 (1993), quoting from Commonwealth v. Pressley, 390 Mass. 617, 620 (1983). See Commonwealth v. Franklin, 465 Mass. 895, 912 (2013) ("[W]here requested by the defendant, a judge should provide specific guidance to the jury regarding the evaluation of such eyewitness testimony through some variation of the approved identification instruction" [emphasis added]); Commonwealth v. Jones, 423 Mass. 99, 110 (1996) ("[O]n request, specific instructions concerning eyewitness identification are often necessary . . . [and] in certain instances, on request, a jury should be instructed that a witness may have been [honestly] mistaken" [emphasis added]). Hence, in the absence of any request for identification instructions, "there was no error by the judge." Commonwealth v. Rodriguez, 457 Mass. 461, 475 (2010). In this case, we conclude that the eyewitness instructions given by the judge were adequate. See note 1, supra.

In addition, viewing the full trial record, from all that appears, defense counsel did not render ineffective assistance,

vis-à-vis, the identification defense.  Defense counsel

vigorously pressed the issue of identification, and that defense

was squarely placed before the jury.[2]  Defense counsel

methodically cross-examined each eye witness, relentlessly

pressing their opportunities and capacities to accurately

observe the faces of the masked intruders, taking each witness

step by step through the entire ordeal, repeatedly eliciting

testimony that only a narrow band of the defendant's face --

from the bridge of his nose to his eyebrows -- was visible, and

that the players were scared and focusing on the gun rather than

the man holding it.  As a result of this insistent line of

questioning, defense counsel was able to elicit inconsistencies

in the witnesses' recollections, such as what the intruders were

wearing, whether they wore gloves, and even the color of their

clothing.  Defense counsel also ensured the jury were aware that

only two out of the ten players were able to identify the

defendant, and that their degree of certainty was only eight out

---

[2] Defense counsel's decision not to request the Rodriguez
instruction may have been tactical.  First, defense counsel may
have strategically decided that a Rodriguez instruction would
have been counterproductive in that it emphasizes the time
within which a perpetrator is seen, that is, Rodriguez instructs
jurors to focus on the eyewitness's "capacity and opportunity to
observe the suspect" and the "length of time before
identification[]."  Here, Shorty clearly spent a lot of time
with the defendant.  Furthermore, the robbery transpired over
thirty minutes during which the two card players observed the
robbers, and the identifications were made by the two card
players within three days of the incident.

of ten.  Defense counsel then expounded on the elicited inconsistencies and "ably targeted [the] infirmities in [the] identification[s]" in his closing.  Commonwealth v. Willard, 53 Mass. App. Ct. 650, 661 (2002).

Furthermore, in concluding that there was neither ineffective assistance of counsel, nor error creating a substantial risk of a miscarriage of justice,[3] we bear in mind that the Commonwealth's identification evidence proving that the defendant was the gunman was strong.  As noted, Shorty, an accomplice in the robbery, testified that the defendant was the gunman and that he and the defendant had planned and carried out the robbery together.  Significantly, Shorty's testimony was corroborated by telephone records.  The Commonwealth introduced telephone records that showed that from June 7 to June 14, 2010, a few days before and the night of the robbery, fifty-eight calls were made or attempted between Shorty and the cell phone number he identified as the defendant's.  Eleven of the telephone calls occurred between midnight and 2:21 A.M. on the night of the robbery.  Shorty and the defendant also exchanged twenty-one text messages between midnight and 2:09 A.M. on the

---

[3] "[I]f an omission of counsel does not present a substantial risk of a miscarriage of justice . . . , there is no basis for an ineffective assistance of counsel claim under either the Federal or the State Constitution."  Willard, supra at 660, quoting from Commonwealth v. Curtis, 417 Mass. 619, 625 n.4 (1994).

night of the robbery.  In addition, Shorty's testimony that the telephone number was that of the defendant was corroborated by the record's showing that fifty-nine calls or attempted calls and seventy-nine text messages were made between that number and the cell phone number of Fernandez, the defendant's "girl."

Further corroborating, and bolstering, the strength of the Commonwealth's proof of identification was the license plate number, 7777-MF, reported by the two card players as being the license plate number on the getaway car, a blue Mitsubishi Galant registered to Fernandez.  Lastly, the day after the robbery, the defendant and Fernandez, in tandem, went to the police station to speak with Detective Cronin in that very same car.

3.  The photo array report.  At trial, Shorty made an in-court identification of the defendant.  Shorty testified at trial that he "believe[d]" he had viewed a photo array and thought he had "pick[ed] someone out," but he could not remember signing his name or putting a date on any photograph.  Detective Cronin later testified that he thought Shorty had selected the defendant's picture from a photo array.  At a sidebar conference, defense counsel stated that he had not received a report of this identification.  The prosecutor indicated that he thought the report existed, but that he would "have to go back and look at everything."  The judge said he would give an

instruction to strike the testimony, if a report existed and had not been disclosed. No report was produced, and defense counsel took no further action. The Commonwealth has represented on appeal that, after a diligent search, no such report of a photo array displayed to Shorty exists.[4]

4. The defendant's nickname. The defendant next claims, for the first time on appeal, that the prosecutor's unobjected-to use of his nickname, "Raw," during Shorty's examination and in closing argument was error and caused a substantial risk of a miscarriage of justice. That is not persuasive. Shorty testified only that he knew the defendant by his nickname "Raw." Thus, the nickname was material to identification. See Commonwealth v. Dyer, 460 Mass. 728, 754 (2011), cert. denied, 132 S. Ct. 2693 (2012), quoting from Commonwealth v. Martinez, 458 Mass. 684, 697-698 (2011) ("[A] prosecutor may refer to, or ask witnesses about, a defendant's nickname . . . when there is a reason to do so"). Further, the use of the nickname "Raw" in

_____

[4] Recently, in Commonwealth v. Crayton, 470 Mass. 228, 241 (2014), and Commonwealth v. Collins, 470 Mass. 255, 265 (2014), the Supreme Judicial Court announced new rules, to be applied prospectively, requiring that, where an eyewitness who was present during the commission of a crime has not participated in a prior, out-of-court identification or has made something less than an unequivocal positive identification of the defendant during a nonsuggestive identification procedure before trial, an in-court showup identification by the witness will be admissible in evidence only where there is "good reason" for its admission. We do not address whether these new rules apply to the instant case, as the defendant's trial commenced prior to the release of those decisions.

the prosecutor's closing argument was consistent with Shorty's testimony.[5]

5. <u>Reference to the barbershop firearms</u>. Prior to trial, the defendant filed a motion in limine to exclude evidence of prior bad acts. The motion in limine was limited to prior criminal charges or criminal conduct. At the motion in limine hearing, prior to trial, the prosecutor indicated that he did not intend to introduce any bad acts evidence.

At trial, during his opening statement, defense counsel, previewing a future challenge to Shorty's truthfulness, referred to a MAC-11 and a sawed-off shotgun (neither of which was the gun used in the robbery). Defense counsel disclosed to the jury that Shorty had told the police that he had seen those guns at the defendant's barbershop prior to the robbery,[6] but no such

---

[5] The defendant also claimed similar error when Detective Cronin used the nickname "Raw" in his testimony. This contention is without merit for the reasons discussed above.

[6] Specifically, in his opening statement defense counsel stated as follows:

   "[The police] got a search warrant to search the establishment of [the defendant], a barbershop in Lowell where . . . Shorty, the convicted criminal, said you're going to find that gun; you're going to find it in the basement of a barbershop in a freezer.

   "So the police get a search warrant. They go to the barbershop. They look for a gun. They don't find that gun.

guns, contrary to Shorty's story, were found in a search conducted at the barbershop. Given this revelation in the defendant's opening, near the end of Shorty's direct examination (before asking any questions about the guns) the prosecutor, at a sidebar conference, requested clarification from the judge concerning whether the defendant's pretrial motion in limine was intended to include as prior bad acts reference to the MAC-11 and the sawed-off shotgun. The judge noted that it was defense counsel who had referenced the MAC-11 and the sawed-off shotgun in his opening statement and, in effect, had opened the door allowing the prosecutor to ask about those guns. Indeed the judge had specifically stated to defense counsel, "I assume that you wouldn't object to him asking questions about that." Defense counsel responded, "No." Thereafter, as Shorty's testimony resumed, Shorty testified that, prior to the robbery, he had seen the defendant at the barbershop with a MAC-11 and a sawed-off shotgun. There was no objection or motion to strike following that testimony.[7]

---

"Shorty told them, 'Oh, by the way, not only is that gun going to be there, there's going to be a sawed-off shotgun and a Mach 11 with a silencer.'

"Police didn't find those guns either."

[7] Defense counsel's belated objections during direct examination of Shorty to questions about why and where the defendant was moving those guns did not preserve the objection as to inadmissible prior bad act evidence -- contrary to the

The defendant now claims that Shorty's testimony concerning those guns was improperly admitted.  There was no error.  That line of inquiry was opened up by the defendant's opening statement.  Further, the testimony was admissible to rebut the argument by defense counsel that because such firearms were not found in a police search of the barbershop, Shorty was a liar. See Commonwealth v. Whitman, 453 Mass. 331, 342 (2009) (citation omitted) ("Rebuttal is legitimate when it responds to the opponent's case").  See also Commonwealth v. Anestal, 463 Mass. 655, 665 (2012) (prior bad act evidence "admissible if it 'rebut[s] the defendant's contentions' made in the course of trial").

Judgments affirmed.

---

defendant's contention.  See Commonwealth v. Howell, 49 Mass. App. Ct. 42, 48 n.7 (2000).