NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13321

COMMONWEALTH vs. RIGOBERTO ESCOBAR.


Middlesex.      November 7, 2023. - March 20, 2024.

Present: Budd, C.J., Gaziano, Kafker, & Wendlandt, JJ.


Homicide. Practice, Criminal, Motion to suppress, Admissions
     and confessions, Voluntariness of statement, Waiver,
     Arraignment, Mistrial, Instructions to jury, Capital case.
     Constitutional Law, Admissions and confessions,
     Voluntariness of statement, Waiver of constitutional
     rights. Evidence, Admissions and confessions,
     Voluntariness of statement, Expert opinion, Fingerprints,
     Firearm. Witness, Expert. Waiver. Firearms. License.



     Indictments found and returned in the Superior Court
Department on March 14, 2015.

     A pretrial motion to suppress evidence was heard by Kathe
M. Tuttman, J., and the cases were tried before Elizabeth M.
Fahey, J.


     Jeffrey L. Baler for the defendant.
     Chia Chi Lee, Assistant District Attorney, for the
Commonwealth.


     KAFKER, J. A jury found the defendant, Rigoberto Escobar,

guilty of murder in the first degree on theories of deliberate

premeditation and extreme atrocity or cruelty for the shooting death of Magno Sosa (victim). In the early morning hours of January 17, 2015, after drinking together, the men got into a heated argument that escalated into a fist fight. After they were separated and the victim left the scene, the defendant followed the victim to a dead-end street and shot him three times, before fleeing and hiding the murder weapon.

On direct appeal, the defendant advances several arguments. He contends that his motion to suppress his confession to the police was erroneously denied, either because he was improperly Mirandized, because improper behavior by the police coerced him to confess involuntarily, or because the police allegedly violated his rights to prompt arraignment and telephone use after arrest. Furthermore, he suggests that the trial judge erred in denying his motion for a mistrial and erred in declining to instruct the jury on voluntary manslaughter and involuntary manslaughter. Finally, he contends that improper testimony by the Commonwealth's experts on fingerprint identification and forensic ballistics created a substantial likelihood of a miscarriage of justice. Separately, the defendant argues that his convictions of possession of a firearm[1]

---

[1] The defendant was convicted of illegal possession of a firearm in violation of G. L. c. 269, § 10 (a), and illegal possession of a loaded firearm in violation of G. L. c. 269,

must be vacated under our recent holding in Commonwealth v. Guardado, 491 Mass. 666 (Guardado I), S.C., 493 Mass. 1 (2023) (Guardado II).

We conclude that the defendant's motion to suppress was properly denied, as was his motion for a mistrial.  We also conclude that the trial judge did not err in declining to provide a jury instruction on involuntary manslaughter.  The trial judge did err, however, in declining to instruct the jury on voluntary manslaughter.  Nonetheless, in view of the jury instructions as a whole, the jury's decision to convict him of murder in the first degree and not murder in the second degree, and the paucity of evidence supporting a finding of voluntary manslaughter, the defendant was not prejudiced by the erroneous decision not to instruct the jury on voluntary manslaughter. Lastly, even assuming that testimony by the Commonwealth's experts was improper, the improper testimony did not create a substantial likelihood of a miscarriage of justice because, separate and apart from the expert testimony, the Commonwealth presented overwhelming evidence tying the defendant to the firearm and to the crime.  Accordingly, we affirm the defendant's conviction of murder in the first degree.  However,

---

§ 10 (n).  The defendant was also convicted of discharging a firearm near a dwelling in violation of G. L. c. 269, § 12E, but that conviction was placed on file, and the defendant does not make any arguments on appeal specific to it.

we vacate the defendant's firearm convictions and remand for a new trial to give the Commonwealth the opportunity to meet its burden under Guardado II to prove that the defendant was not licensed to carry a firearm.

1.  Background.  a.  Facts.  We recite the facts as the jury reasonably could have found them, reserving certain facts for our discussion of the legal issues.

At around 9 P.M. on the evening of January 16, 2015, the defendant went to the Everett home of his friends Johnny Pineda and Oscar Interiano.  The three men drank together, and at around 11:45 P.M., they drove in Pineda's truck to a local restaurant.  At the restaurant, they met the victim, a Nantucket resident who was visiting friends in Everett.  All four remained at the restaurant, socializing and drinking, until 1 A.M. on January 17, when the restaurant closed.  Pineda drove the four men back to his house, stopping at the defendant's house on the way, where the defendant briefly went inside and retrieved a .40 caliber pistol he owned.

Shortly after returning to Interiano and Pineda's house, the defendant, the victim, and Interiano began arguing.[2]  As the

_____

[2] Evidence at trial suggested that the defendant and the victim were arguing about a video recording they had watched, but contradictory evidence was introduced regarding the contents of the recording.  In his statement to police the day after the murder, which was recorded and played for the jury, the

argument escalated, Pineda told the three men that if they had any problems with each other, they should take it outside.

Once outside, the argument turned physical, with the defendant and the victim pushing each other and throwing punches at one another. Interiano attempted to separate the victim and the defendant, but he also pushed and punched the victim. At one point, the victim fell to the ground, and the defendant and Interiano kicked him. After a few minutes of fighting, Interiano succeeded in separating the defendant and the victim, and the victim left the scene. The defendant told Interiano to go inside and open the back door, and that he would meet Interiano there. Interiano went inside, but the defendant followed the victim down the road to Elmwood Street, a dead-end road roughly 200 feet away. The defendant then shot the victim at close range, within one or two feet, through the right eye. The victim fell, and the defendant shot the victim twice more through the back of the head.

The defendant fled the scene, running between houses and jumping over a fence to return to Interiano and Pineda's house. Interiano opened the back door and let him in. Interiano asked

---

defendant stated that the argument had started over a video recording of a football match. In his testimony at trial, the defendant instead stated that the video recording showed Pineda being arrested. Police searched the victim's cell phone and found only a short video recording of animated Christmas lights.

what had happened, and the defendant replied that the man he had had a problem with would not be able to talk.  The defendant showed Interiano the firearm and asked to hide it at the house.  Interiano replied that he could hide it anywhere but his bedroom, so the men wrapped the firearm in a shirt and hid it in a rolled-up carpet in the basement.  Hearing police sirens outside, the defendant told Interiano he would sleep on the couch in the living room, but when Interiano woke up at 6:30 A.M., the defendant was gone.

The defendant testified at trial and denied shooting the victim.  He stated that he had retrieved the firearm from his home because Pineda and Interiano had expressed interest in purchasing it and that he hid the firearm in the basement as soon as they arrived at Interiano and Pineda's house.  He acknowledged fighting the victim outside but maintained that after the fist fight he went home and went to sleep.

b.  The defendant's interrogation.  We recite the facts as found by the motion judge when considering the defendant's motion to suppress.  See Commonwealth v. Medina, 485 Mass. 296, 299-300 (2020).

Shortly before 9:30 P.M. on January 17, 2015, a group of State police detectives and Everett police officers went to the defendant's home.  Officer Nancy Butler, an Everett police officer and native Spanish speaker, accompanied the officers to

ensure the defendant understood what was said to him. The officers entered the defendant's bedroom with their weapons drawn. They awakened the defendant, who had been asleep, and holstered their weapons. Butler informed the defendant that the officers wished to speak with him and requested that he accompany them to the Everett police station, but that he was not required to do so. The defendant agreed to accompany the officers and was transported to the Everett police station.

At the police station, the defendant waited for over three hours, and then was brought to an interrogation room at around 12:55 A.M. Butler read the defendant the Miranda warnings in Spanish from a booking form and asked the defendant if he understood his rights. The defendant replied, "Yes." Butler asked the defendant to read the Spanish form that she had read to him. The defendant reviewed the forms for a few minutes and stated that he had read the form. Both the defendant and Butler signed the form.

State police Trooper Michael Cashman and Everett police Detective Daniel Tucker proceeded to interview the defendant, with Butler translating. At the beginning of the interview, the officers did not inform the defendant that he was a suspect or tell him why he was being interviewed. After about twenty minutes, however, the officers told the defendant they knew what had happened, that he had to tell them the truth, and that he

would only have one chance to tell what happened. The defendant acknowledged that he had had an argument with the victim that had escalated to a fight, but he denied that anything more serious had occurred. The officers told the defendant that they knew he was lying, and that they could not help him unless he told the truth. They also told him that they had recovered security camera footage that proved he was lying, and that they would recover "microscopic" evidence from his apartment that would prove he was lying.

The defendant reiterated that he had gotten into a fist fight with the victim for about five minutes but denied that the victim had been injured, stating that the victim was standing when the defendant walked home after the fight. The officers then told the defendant that the victim had been killed in the same area where the fight took place, and that many people had stated that the defendant carried a gun. The officers also told the defendant that they had been told the defendant was involved with the 18th Street gang, and that the victim was associated with the gang MS-13. The defendant denied carrying a gun and denied having any involvement with gangs.

Later in the interview, the officers informed the defendant that they had searched Interiano and Pineda's house and had recovered the defendant's firearm. The defendant changed his posture, slumped forward in his chair, and put his head down.

After a few more minutes of questioning, the defendant stated that he had been very drunk, that he had been fighting with the victim, and that the fight had continued as the defendant and the victim went from the house to Elmwood Street.[3]  He stated that they kept fighting and he went crazy, took the gun out, and fired several times at the victim at close range.  He stated that he did not know how many times he had fired the gun.  He also stated he did not know where he had hit the victim but did see the victim fall to the ground.  Afterward, he returned to Interiano and Pineda's house, where he hid the gun in the basement and then went home.  Following the interview, the defendant was placed under arrest and booked.

At trial, the defendant testified that he lied during the interrogation in order to prevent his friends from getting in trouble.  He also stated that he did not understand his Miranda rights when they were read to him, and that he generally had trouble understanding Butler's Spanish translation during the interrogation.

---

[3] The defendant gave conflicting answers as to whether there was a break in the fighting between the fist fight at the house and the fight that led to the victim's death.  When asked originally, the defendant agreed that the victim had left the scene of the fight at the house and that the defendant had followed him.  Later, the defendant denied having followed the victim, stating that they "kept fighting" as they both walked from the house to Elmwood Street, where the defendant shot the victim.

c.  Procedural history.  The defendant moved to suppress his statement to the police.  He argued that he had not been properly given Miranda warnings, had not knowingly waived his rights, and, in the alternative, had not made the statements voluntarily.  He suggested that because the officers interviewing him had improperly implied that the interview would be his only chance to tell his story, had made assurances to him that a confession would assist him, and lied about the evidence to which they had access, his statement was the result of police coercion.  He also contended that his right to make a telephone call under G. L. c. 276, § 33A, was violated because he was not informed of his right to make a telephone call until the end of the interview.

Following an evidentiary hearing, the motion judge concluded that the defendant's interview was a custodial interrogation within the meaning of Miranda v. Arizona, 384 U.S. 436 (1966), and its progeny.  However, the motion judge also found that Butler read the complete Miranda warnings to the defendant, and the defendant read the warnings himself, "which he was able to do without difficulty. . . .  The Miranda warnings were thus properly conveyed to the defendant." The motion judge also concluded that the defendant was not unlawfully deprived of his telephone rights.

Following a jury trial, the defendant was convicted of

murder in the first degree, unlawful possession of a firearm, and unlawful possession of a loaded firearm.  The defendant timely appealed.

2.  Discussion.  a.  Motion to suppress.  The defendant advances several arguments as to why his January 18, 2015 statement to the police should have been suppressed.  We address each in turn.

i.  Miranda warnings.  First, the defendant argues that he was not properly given his Miranda warnings and consequently did not knowingly, intelligently, and voluntarily waive his Miranda rights.  "A defendant's waiver of his or her Miranda rights must be made knowingly, intelligently, and voluntarily." Commonwealth v. Delossantos, 492 Mass. 242, 247 (2023).  The Commonwealth must prove beyond a reasonable doubt that the defendant's waiver of Miranda rights was valid, and "must demonstrate not only what warnings were provided to the defendant, but also that the defendant understood such warnings."  Id., citing Commonwealth v. The Ngoc Tran, 471 Mass. 179, 186 n.6 (2015).  "In reviewing a judge's determination regarding a valid waiver of Miranda rights and voluntariness, we accept the judge's subsidiary findings of fact absent clear error, give substantial deference to the judge's ultimate findings and conclusions of law, but independently review the correctness of the judge's application of constitutional

principles to the facts found" (quotation and alterations omitted).  Delossantos, supra at 250, quoting Commonwealth v. Vao Sok, 435 Mass. 743, 751 (2002).

In the present case, we see no reason to disturb the motion judge's findings of fact or well-reasoned conclusions of law. As the motion judge noted, the defendant was read the Miranda warnings in Spanish by a native Spanish speaker, and he verbally confirmed that he understood the warnings.[4]  He then read the warnings himself, "which he was able to do without difficulty," and signed a statement affirming that he understood his rights. Furthermore, it is clear based on the record that the defendant waived his rights knowingly, intelligently, and voluntarily. The motion judge found:

> "[T]he defendant was sober, alert, focused, and responsive
> to questions.  He felt comfortable asking for clarification
> when he did not understand a particular question.  After
> receiving the warnings, the defendant demonstrated with
> words and with behavior that he heard, read, and understood
> them . . . and that he agreed to speak with officers."

Accordingly, we conclude, as the motion judge did, that the defendant was properly given his Miranda warnings and made a

---

[4] The transcript of the defendant's interview with police suggests that Butler mispronounced two Spanish words, "contestar" and "guardar," as "contester" and "guarder," respectively.  Despite the defendant's contention on appeal that these minor mispronunciations caused him not to understand the Miranda warnings, we note that during the interview the defendant stated that he understood the warnings as read to him, and subsequently he had the opportunity to read the warnings in Spanish, which provided the correct terms.

knowing, intelligent, and voluntary waiver of his Miranda rights. See Delossantos, 492 Mass. at 250.

ii. Police misconduct and voluntariness. The defendant next contends that improper behavior by the police officers who interviewed him on January 18 rendered his statement to the police involuntary, thus requiring that the statements be suppressed. Although the voluntariness of a Miranda waiver and the voluntariness of a statement to police are distinct inquiries, in both cases the issue on appeal is "whether the Commonwealth has proved, by a totality of the circumstances, that [the defendant] made a voluntary, knowing, and intelligent waiver of his rights, and that his statements were otherwise voluntary." Commonwealth v. Gallett, 481 Mass. 662, 655 (2019), quoting Commonwealth v. LeBeau, 451 Mass. 244, 254-255 (2008). Where there is evidence of misconduct by police during an interrogation, a defendant's statement will be considered involuntary if the misconduct by police resulted in the defendant's will being overborne. See, e.g., Commonwealth v. Durand, 457 Mass. 574, 596-597 (2010), S.C., 475 Mass. 657 (2016), cert. denied, 583 U.S. 896 (2017) (no suppression required where "the incriminating statements made by the defendant were not tied to or otherwise made in response to the pressure tactics employed by the officers").

The motion judge found that the officers interviewing the

defendant had acted improperly by making assurances that a confession would assist the defendant and by telling him that they would find incriminating "microscopic evidence" in his home and that the interview was the only chance for him to tell his side of the story.  However, the motion judge noted that the officers "made only one reference that could be interpreted as suggesting that cooperation would result in a lesser sentence," that the officers made only a single false representation (regarding inculpatory "microscopic evidence" in the defendant's home), and that the officers referred to a judge hearing only "the other side of the story" on one occasion.  The motion judge also found that the defendant continued to deny any involvement in the victim's death despite the improper pressure tactics.  Rather, the defendant only confessed when he was informed that the gun used in the attack had been found.  Therefore, the motion judge concluded that the defendant's will was not overborne by the improper interrogation techniques.  We agree.

Assurances by police, "express or implied that [a confession would] aid the defense or result in a lesser sentence" may render a confession to police involuntary and require its suppression (citation omitted).  See Commonwealth v. Williams, 486 Mass. 646, 661 (2021).  We have also "expressed our disapproval of police tactics that employ the use of false statements during an interrogation because such tactics cast

doubt on the voluntariness of any subsequent confession or admission." Commonwealth v. Tremblay, 460 Mass. 199, 208 (2011). Finally, police may not tell a defendant that if he does not speak with them, a judge or jury will never hear his side of the story. See Commonwealth v. Novo, 442 Mass. 262, 268-269 (2004), S.C., 449 Mass. 84 (2007) ("plainly untrue" statements suggesting "that [the defendant's] right to tell his side of the story to a jury was conditioned on his revealing it to them during the interview" violated defendant's constitutional rights and rendered his confession inadmissible). However, there must be a causal link between police misconduct and a defendant's statement such that the defendant's will is overborne for the statement to be suppressed as involuntary. Compare Durand, 457 Mass. at 596-597 (suppression not required where "the incriminating statements made by the defendant were not tied to or otherwise made in response to the pressure tactics employed by the officers"), with Novo, supra at 267-269 ("now or never" theme, which was "repeated incessantly," and "persisted up to and through [the defendant's] confession" cast substantial doubt on voluntariness of subsequent confession and required suppression).

We conclude, as did the motion judge, that during the interview, "the defendant resisted all efforts to pressure him to admit his involvement in the shooting, despite repeated and

intense admonitions to cooperate."  Rather, the defendant admitted to the shooting only after the officers truthfully told him that they had recovered his gun, when he recognized "that the evidence against him was overwhelming."  We also note the motion judge's finding that "[d]uring the entire interview, the defendant remained calm, alert, focused and responsive.  He did not appear to be physically uncomfortable, unduly fatigued, or in any apparent distress."  Once the defendant was confronted with the fact that police had recovered the firearm, however, "[he] changed his posture and slumped forward in his chair and put his head down" before confessing to shooting the victim.  This strengthens the conclusion that it was not improper tactics by police but tangible evidence of his guilt that convinced the defendant to confess to the murder.  Accordingly, although the officers may have acted improperly in questioning the defendant, these improper tactics did not coerce the defendant into confessing, and thus his confession to the police was voluntary. See Durand, 457 Mass. at 596-597.

iii.  Telephone right.  The defendant next argues that his statement to police should have been suppressed because he was not informed of his right to use a telephone under G. L. c. 276, § 33A.  We review the motion judge's denial of the defendant's motion to suppress on this ground for clear error.  See Commonwealth v. Morris, 492 Mass. 498, 509 (2023).

Under G. L. c. 276, § 33A, an arrested person has a right to make a telephone call. If an arrested person's right to make a telephone call is intentionally violated, statements made to police must be suppressed. Gallett, 481 Mass. at 672, citing Commonwealth v. Walker, 466 Mass. 268, 278 (2013). However, "[a] defendant's rights under [§ 33A] are triggered by . . . formal arrest, not by the custodial nature of any prearrest interrogation." Commonwealth v. Hampton, 457 Mass. 152, 155 (2010), citing Commonwealth v. Rivera, 441 Mass. 358, 374-375 (2004).

A formal arrest occurs when there is (1) "an actual or constructive seizure or detention of the person," (2) "performed with the intention to effect an arrest," and (3) it is "so understood by the person detained." Hampton, 457 Mass. at 158, quoting Commonwealth v. Cook, 419 Mass. 192, 198 (1994), S.C., 447 Mass. 1023 (2006) and 451 Mass. 1008 (2008). Whether a defendant has been seized depends on whether, given the totality of the circumstances, "a reasonable person would have believed he was not free to leave." Commonwealth v. Martinez, 458 Mass. 684, 695 (2011), quoting Cook, supra at 199.

Here, the motion judge found that the defendant was in custody for Miranda purposes during his interview with the police. The judge reasoned that because the defendant was awakened by several police officers with their weapons drawn, a

reasonable person in his circumstances would not have felt free to decline the officers' request that he come to the police station.  Indeed, the defendant waited at the police station for over three hours before being brought to the interview room, leading the motion judge to conclude that "no person in the defendant's circumstances would have remained for such a long period of time if he felt free to leave."  The motion judge nonetheless concluded that, notwithstanding the custodial nature of the police interview, the defendant was not unlawfully deprived of his telephone rights because he was not formally arrested until he was booked after the interview concluded.

Police officers testified at the motion to suppress hearing that they did not intend to arrest the defendant until he admitted to the murder when confronted with the evidence of the firearm recovered from Interiano and Pineda's house.  This police testimony was implicitly credited by the motion judge, who concluded that the police interrogation of the defendant preceded his formal arrest.  We discern no error in the motion judge's conclusion, particularly where, as discussed infra, there is substantial evidence that until the defendant confessed to the murder, the police believed they lacked probable cause to arrest him.  See Hampton, 457 Mass. at 158 (no arrest necessitating telephone rights where police lacked intent to arrest defendant until after they obtained incriminating

statement during interview).

iv. _Prompt arraignment_. The defendant next contends that his statements should have been suppressed because they were taken in violation of his right to a prompt arraignment. After being arrested, a criminal defendant has the right to be arraigned "as soon as is reasonably possible." _Commonwealth_ v. _Powell_, 468 Mass. 272, 275 (2014), citing Mass. R. Crim. P. 7 (a) (1), as appearing in 461 Mass. 1501 (2012). In _Commonwealth_ v. _Rosario_, 422 Mass. 48, 56 (1996), we established a bright-line rule governing the admissibility of statements made by defendants awaiting arraignment. Otherwise admissible statements made in the six-hour window following arrest will not be suppressed on the ground of unreasonable delay in arraignment, but "[s]tatements made after the six-hour period following arrest are inadmissible." _Powell_, _supra_ at 276, citing _Rosario_, _supra_ at 56-57. The issue of prompt arraignment was not raised prior to the instant appeal, and thus we review the issue only for a substantial likelihood of a miscarriage of justice. See _Commonwealth_ v. _Miranda_, 492 Mass. 301, 305 (2023), quoting _Commonwealth_ v. _Denson_, 489 Mass. 138, 144 (2022).

The six-hour _Rosario_ safe harbor period begins when a defendant is arrested. _Martinez_, 458 Mass. at 694, citing _Rosario_, 422 Mass. at 56. "An arrest occurs where there is [1]

'an actual or constructive seizure or detention of the person, [2] performed with the intention to effect an arrest and [3] so understood by the person detained.'" <u>Martinez</u>, <u>supra</u> at 694-695, quoting <u>Commonwealth</u> v. <u>Grandison</u>, 433 Mass. 135, 145 (2001). Whether a defendant has been seized depends on whether, given the totality of the circumstances, "a reasonable person would have believed he was not free to leave." <u>Martinez</u>, <u>supra</u> at 695, quoting <u>Cook</u>, 419 Mass. at 199. The defendant's interview ended at around 6 <u>A</u>.<u>M</u>. on January 18, 2015, so the issue is whether the defendant was arrested prior to midnight on January 18.

As discussed <u>supra</u>, the motion judge concluded that the defendant was in police custody and thus was seized, as evidenced by the fact that the defendant was awakened by multiple police officers with their weapons drawn, as well as the fact that he stayed in the Everett police station for several hours before his interrogation began, which suggests that a reasonable person in the defendant's circumstances would not have felt free to leave.

As to the second prong, there was evidence presented at the motion to suppress hearing that police did not intend to arrest the defendant until he confessed to the killing at around 4 <u>A</u>.<u>M</u>. Trooper Cashman testified that he did not believe he had probable cause to arrest the defendant until the defendant

confessed to shooting the victim. Cashman also stated that prior to the confession, the defendant was free to leave the interview. When the defendant's interview began, police were still actively investigating the murder and had not concluded that the defendant had killed the victim. Indeed, police only recovered the defendant's firearm at around 3 A.M., in the middle of the defendant's interrogation, which supports the conclusion that when the defendant's interrogation began at 12:55 A.M., the police did not intend to arrest him. Thus, even assuming that the defendant was constructively arrested at 4 A.M., when he confessed to killing the victim and police thus understood that they had probable cause to arrest him, the defendant's interrogation was concluded prior to the close of the six-hour Rosario safe harbor. Therefore, the admission of the defendant's statement to police did not create a substantial likelihood of a miscarriage of justice on this basis. See Martinez, 458 Mass. at 594; Rosario, 422 Mass. at 56.

b. Motion for a mistrial. Next, the defendant contends that the trial judge abused her discretion in denying the defendant's motion for a mistrial. Prior to trial, the trial judge ruled that there would be no mention of any witness's immigration status during the trial without prior approval of the court. Additionally, the defense and the Commonwealth agreed to certain redactions from the video recording of the

defendant's police interview before it was shown to the jury.

On the seventh day of the trial, defense counsel moved for a mistrial, or, in the alternative, sanctions against the Commonwealth. The defendant challenged three pieces of evidence introduced at trial: testimony by Everett police Lieutenant Scott Stallbaum that Everett has a large population of undocumented immigrants; testimony by police Officer Michael Lavey referring to the defendant's home as "like a boarding house, undocumented wooden house"; and a portion of the unredacted police interview videotape inadvertently shown to the jury, which included a statement that "many people have told [the police] that [the defendant] carries a gun" and the question "do you know where Eighteenth Street is?" the latter being a reference to the Eighteenth Street gang. The trial judge denied the motion for a mistrial.

"The decision whether to declare a mistrial is within the discretion of the trial judge." Commonwealth v. Bryant, 447 Mass. 494, 503 (2006). Accordingly, we defer to the trial judge's decision unless that decision represents a "clear error of judgment in weighing the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives" (quotation and citation omitted). L.L. v. Commonwealth, 470 Mass 169, 185 n.27 (2014). "Where a party seeks a mistrial in response to the jury's exposure to

inadmissible evidence, the judge may 'correctly rel[y] on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant.'"  Bryant, supra, quoting Commonwealth v. Kilburn, 426 Mass. 31, 37-38 (1997).

We discern no abuse of discretion by the trial judge in denying the defendant's motion for a mistrial.  At the beginning of his direct examination, the prosecutor asked Lieutenant Stallbaum to identify the cities and towns that border Everett and to provide the approximate population of Everett.  Stallbaum replied, "On the census, I think it's thirty-five to forty thousand, but we have a large undocumented community, so it's probably around fifty thousand."  The Commonwealth argued that this line of questioning was appropriate to familiarize the jury with the city of Everett.  The prosecutor further stated that Stallbaum's statement about the undocumented population of Everett was a surprise to the prosecution, and that the statement by itself did not imply that the defendant was a member of Everett's undocumented population.  Similarly, Lavey's testimony describing the defendant's home as an undocumented boarding house appears to have been spontaneous testimony by the officer in response to an otherwise permissible question by the prosecution.  Furthermore, Lavey's answer was objected to by the defendant and struck by the judge, and the jury were instructed to disregard the answer.  Accordingly, the record does not

suggest that either remark was so inflammatory that the trial judge abused her discretion in not declaring a mistrial. See Commonwealth v. Doughty, 491 Mass. 788, 796-797 (2023) (no abuse of discretion in denying motion for mistrial where statement was surprise to prosecutor, not highlighted, and not repeated during remainder of trial). See also Bryant, 447 Mass. at 503-504 (discussing cases where spontaneous statements by witnesses did not require mistrial).

Regarding the unredacted videotaped interview, the judge found that the Commonwealth showed the unredacted portion of the video recording by mistake and turned off the tape when the mistake was realized. The trial judge offered to provide a curative instruction to the jury, but this offer was rejected by the defense counsel, who reasoned that a curative instruction would draw attention to the redacted material. We thus find no abuse of discretion by the trial judge in denying the defendant's motion for a mistrial. See Bryant, 447 Mass. at 503 (curative instructions are adequate means to correct errors and to remedy prejudice to defendant from inadmissible evidence being presented at trial).

c. Jury instructions. The defendant requested that the jury hear instructions on both voluntary manslaughter and involuntary manslaughter. On appeal, the defendant contends that the trial judge erred by declining to provide these jury

instructions.  We address each proposed jury instruction in turn.

i.  <u>Voluntary manslaughter instruction</u>.  The defendant argues that the judge erred in failing to instruct the jury on voluntary manslaughter based on mitigating factors of reasonable provocation, sudden combat, and excessive use of force in self-defense.  Because the defendant preserved the issue,[5] we review for prejudicial error, "inquir[ing] whether there is a reasonable possibility that the error might have contributed to the jury's verdict."  <u>Miranda</u>, 492 Mass. at 306, quoting <u>Commonwealth</u> v. <u>Odgren</u>, 483 Mass. 41, 46 (2019).  "Voluntary manslaughter is an unlawful killing arising not from malice, but from . . . sudden [heat of] passion induced by reasonable provocation, sudden combat, or [the use of] excessive force in self-defense."  <u>Miranda</u>, <u>supra</u> at 307, quoting <u>Commonwealth</u> v. <u>Richards</u>, 485 Mass. 896, 918 (2020).  "In deciding whether an instruction is warranted regarding these mitigating circumstances, the evidence must be viewed in the light most favorable to the defendant."  <u>Miranda</u>, <u>supra</u>, quoting <u>Richards</u>,

_____

[5] Based on the record, it does not appear that the defendant specifically objected to the omission of the voluntary manslaughter instruction, but we nonetheless consider the issue preserved where, as here, "defense counsel requests a specific instruction and the judge rejects it, or gives an instruction inconsistent with the requested one."  <u>Commonwealth</u> v. <u>Vacher</u>, 469 Mass. 425, 442-443 (2014).  We also note that the Commonwealth agrees that the issue was properly preserved.

supra.

A. Reasonable provocation and sudden combat. An instruction on reasonable provocation must be given

> "where the evidence raises 'a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant."

Richards, 485 Mass. at 918, quoting Commonwealth v. Rhodes, 482 Mass. 823, 826 (2019). Although "physical contact between a defendant and a victim is not always sufficient to warrant a manslaughter instruction," Commonwealth v. Walden, 380 Mass. 724, 727 (1980), "even a single blow[] may amount to reasonable provocation," Model Jury Instructions on Homicide 77 (2018).

Sudden combat is a form of reasonable provocation that we have long described as when two people "meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant," and in the course of such combat one combatant kills the other with a deadly weapon. Commonwealth v. Howard, 479 Mass. 52, 58 (2018), quoting Commonwealth v. Webster, 5 Cush. 295, 308 (1850). Neither a reasonable provocation instruction nor a sudden combat instruction is necessary if the defendant "cooled off and regained a measure of self-control before attacking the victim," or where there is a

break in the fight "and then the defendant seeks out the victim" (quotations and citations omitted). Miranda, 492 Mass. at 307.

In the light most favorable to the defendant, the jury heard evidence that the defendant and the victim were arguing as they left the house, and that once outside, the argument escalated and turned violent, with both men pushing each other, throwing punches, and fighting on the ground after both men fell. The jury might also have credited the defendant's statement to the police denying that he followed the victim, and instead asserting that the two men "kept fighting" as they walked from the house to Elmwood Street, and that once on Elmwood Street, the defendant "went crazy," pulled out the pistol, and fired several times at the victim. The jury therefore could have concluded, if they credited this statement, as opposed to others made by the defendant or other witnesses, that the defendant killed the victim in the heat of passion arising from reasonable provocation or sudden combat. As a result, the judge erred in not instructing the jury on voluntary manslaughter.

Where the defendant requested voluntary manslaughter instructions and the judge did not provide them, we must decide whether this error was prejudicial. "An error is not prejudicial only if the Commonwealth can show 'with fair assurance . . . that the judgment was not substantially swayed'

by it." Commonwealth v. Martin, 484 Mass. 634, 647 (2020),
cert. denied, 141 S. Ct. 1519 (2021), quoting Commonwealth v.
Rosado, 428 Mass. 76, 79 (1998). In other words, we must decide
"whether there is a reasonable possibility that the error might
have contributed to the jury's verdict." Miranda, 492 Mass. at
306, quoting Odgren, 483 Mass. at 46. We conclude, with fair
assurance, that the defendant was not prejudiced by this error.

The trial judge instructed the jury on murder in the first
degree on theories of deliberate premeditation and extreme
atrocity or cruelty, as well as murder in the second degree.
The jury were instructed that to convict the defendant of murder
in the first degree with deliberate premeditation, they must
find beyond a reasonable doubt that the defendant decided to
kill the victim after a period of reflection, meaning that the
defendant considered whether to kill the victim and decided to
kill him and the killing arose from that decision. The jury
were specifically instructed that there is no deliberate
premeditation where the action is taken so quickly that a
defendant takes no time to reflect on the action. As a result,
if the jury had a reasonable doubt whether the events occurred
as described by the defendant to the police, which involved a
protracted fight and the defendant "[going] crazy" before
shooting the victim, they were required to find the defendant
not guilty of murder in the first degree with deliberate

premeditation. Instead, they found the defendant guilty on theories of both deliberate premeditation and extreme atrocity or cruelty. The defense at trial was also that the defendant did not shoot the victim, but only fought with him, and that someone else did the shooting. Because of these instructions and the paucity of evidentiary support for a finding of voluntary manslaughter, see infra, we conclude with fair assurance that the defendant was not prejudiced by the erroneous omission of the voluntary manslaughter instruction. See Martin, 484 Mass. at 647-648 (jury instructions and verdict inconsistent with jury believing version of events supporting voluntary manslaughter, coupled with "feeble evidence" supporting manslaughter, made clear defendant was not prejudiced by failure to instruct jury on manslaughter). Cf. Commonwealth v. Felix, 476 Mass. 750, 758-759 (2017) ("the time required to strangle the victim . . . supported a finding of deliberate premeditation inconsistent with sudden provocation").

The tenuous evidence that could support a verdict of voluntary manslaughter on theories of reasonable provocation or sudden combat contributes to our conclusion that the defendant was not prejudiced by the omission of instructions on reasonable provocation or sudden combat. See Martin, 484 Mass. at 647-648. In order for the defendant to have been found guilty of voluntary manslaughter because of reasonable provocation or

sudden combat, the jury would have needed to credit the defendant's statement that he did not follow the victim and that instead the fight continued without stopping for nearly three hundred feet from the driveway to Elmwood Street, where the victim's body was found. See Miranda, 492 Mass. at 307 ("Regardless of the theory evoked, a voluntary manslaughter instruction is not warranted when the defendant 'cooled off' and regained a measure of self-control before attacking the victim or where the defendant and victim are separated for a few minutes following the provocation and then the defendant seeks out the victim" [quotations and citations omitted]). To so find, the jury would have needed to disbelieve the defendant's earlier statement to the police that he followed the victim after the victim left the house, the trial testimony of Interiano and Pineda that the defendant followed the victim after the victim fled, and the defendant's own trial testimony, where he denied involvement in shooting the victim entirely. The improbability of this finding by the jury supports our conclusion that the defendant was not prejudiced by the trial judge's erroneous omission of jury instructions on sudden combat or reasonable provocation. See Martin, supra at 648 ("feeble evidence supporting a finding of manslaughter" contributed to conclusion that defendant was not prejudiced by failure to instruct on voluntary manslaughter).

B.  Excessive use of force in self-defense.  To receive a jury instruction on excessive use of force in self-defense, "the defendant must be entitled to act in self-defense." Commonwealth v. Yat Fung Ng, 489 Mass. 242, 266 (2022), S.C., 491 Mass. 247 (2023), quoting Commonwealth v. Anestal, 463 Mass. 655, 674 (2012).  In turn, a self-defense instruction is only necessary where "there is some evidence that the defendant availed himself of all means, proper and reasonable in the circumstances, of retreating from the conflict before resorting to the use of deadly force."  Yat Fung Ng, supra at 253, quoting Commonwealth v. Benoit, 452 Mass. 212, 226-227 (2008).

Even viewing the evidence in the light most favorable to the defendant, no reasonable jury could conclude, solely on the basis of the defendant's isolated statement to the police, that after fighting for several minutes in front of the house, the defendant and the victim "kept fighting" over a distance of nearly three hundred feet to where the victim was shot on Elmwood Street, and that at no point did the armed defendant have the opportunity to retreat.  There was also undisputed evidence that Interiano interceded in the fight and separated the defendant and the victim at least once.  See Commonwealth v. Berry, 431 Mass. 326, 335 (2000) (defendant not entitled to self-defense instruction where "the fight was on a public street and at least at some point [the defendant] had adequate means of

escape").  Finally, the only apparent injury to the defendant was to his knuckles.  Accordingly, the trial judge did not err in declining to instruct the jury on voluntary manslaughter under the theory of excessive use of force in self-defense.

ii.  Involuntary manslaughter.  The defendant also argues that the trial judge erred by declining to give an instruction on involuntary manslaughter.  When a defendant is charged with murder, an instruction on involuntary manslaughter is appropriate where a "reasonable view of the evidence would [permit] the jury to find wanton [or] reckless conduct rather than actions from which a plain and strong likelihood of death would follow" (quotations omitted).  Commonwealth v. Concepcion, 487 Mass. 77, 92, cert. denied, 142 S. Ct. 408 (2021), quoting Commonwealth v. Tavares, 471 Mass. 430, 438 (2015).  Conversely, "[w]hen it is obvious . . . that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required" (citation omitted).  Commonwealth v. Moseley, 483 Mass. 295, 303 (2019).  The defendant requested an involuntary manslaughter instruction and objected when it was denied, so we review for prejudicial error.  See Commonwealth v. Pina, 481 Mass. 413, 417-418 (2019).

A defendant shooting at a victim creates a plain and strong likelihood of death, negating the possibility of a finding of

involuntary manslaughter.  See, e.g., Concepcion, 487 Mass. at 93 (no involuntary manslaughter instruction necessary where "defendant shot a firearm at the victim multiple times, firing an initial pair of rounds before changing his position and continuing to shoot"); Commonwealth v. Watt, 484 Mass. 742, 752 (2020), S.C., 493 Mass. 216 and 493 Mass. 322 (2024) (no involuntary manslaughter instruction required where apparent shooter "intentionally shot multiple times at the two victims"). "[D]ischarging a shot at another person, regardless of whether the shot is meant to injure or kill, . . . 'creates a plain and strong likelihood of death.'"  Pina, 481 Mass. at 424, quoting Commonwealth v. Mack, 423 Mass. 288, 290 (1996).

In the present case, the jury heard the defendant's statement to police that as the defendant and the victim continued to fight, the defendant "went crazy and . . . got the weapon out" and fired at the victim.  Although the defendant also told the police that he did not see where he hit the victim, the jury heard evidence that the victim was shot through the eye at close range and was also shot twice in the back of the head.  The evidence that the defendant was drinking does not change our analysis.  See Commonwealth v. Sires, 413 Mass. 292, 302-303 (1992) (even where there is evidence that defendant had consumed alcohol, "[t]he traditional elements of involuntary manslaughter must be shown by evidence that the jury might

believe before an instruction on involuntary manslaughter is required"). Even considering the evidence in the light most favorable to the defendant, no reasonable jury could conclude that shooting at the victim at close range did not present a plain and strong likelihood of death, and thus the trial judge did not err in declining to instruct the jury on involuntary manslaughter. See Pina, 481 Mass. at 424.

d. Testimony on scientific certainty. Finally, the defendant postulates that expert testimony describing fingerprint evidence and ballistic evidence "in absolute terms" caused a substantial likelihood of a miscarriage of justice.[6]

i. Fingerprint testimony. The defendant argues that expert testimony by the Commonwealth's fingerprint analysis expert impermissibly suggested a level of scientific certainty in testimony identifying a fingerprint on the firearm magazine as belonging to the defendant. The defendant did not object to the expert's testimony, so we review the testimony to determine

---

[6] The defendant also argues that the failure by defense counsel to object to the improper testimony constitutes ineffective assistance of counsel. When a defendant has been convicted of murder in the first degree, "we review his claim of ineffective assistance of counsel to determine whether the alleged lapse created a 'substantial likelihood of a miscarriage of justice,'" so both inquiries are ultimately the same. Commonwealth v. Louis, 487 Mass. 759, 763 (2021), quoting Commonwealth v. Fulgiam, 477 Mass. 20, 29, cert. denied, 583 U.S. 923 (2017).

whether the testimony was improper and whether any improper testimony created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Armstrong, 492 Mass. 341, 354 (2023).

State police Trooper Sidney Chambers testified as to the fingerprint identification that matched a latent fingerprint[7] on the magazine of the firearm recovered at Interiano and Pineda's house with the defendant's left ring finger.  During cross-examination defense counsel asked Chambers, "Now you can't say that one hundred percent, you cannot be one hundred percent [certain] of the identification you made with the print; can you?" to which Chambers responded, "No, I absolutely can."  When pressed, Chambers reaffirmed that he was one hundred percent certain that his identification of the fingerprint as belonging to the defendant was correct.

We have previously considered scientific literature on the limitations of ACE-V[8] fingerprint analysis -- the methodology used by Chambers in this case.  See Commonwealth v. Gambora, 457

---

[7] A latent fingerprint is a fingerprint impression that is generally not visible to the naked eye without chemical enhancement.  See Commonwealth v. Patterson, 445 Mass. 626, 629 (2005).

[8] ACE-V stands for analysis, comparison, evaluation, and verification.  Commonwealth v. Gambora, 457 Mass. 715, 721 (2010).

Mass. 715, 724-726 (2010).  We have therefore offered guidance that "[t]estimony to the effect that a latent print matches . . . a known print, if it is to be offered, should be presented as an opinion, not a fact, and opinions expressing absolute certainty about, or the infallibility of, an 'individualization' of a print should be avoided."  Id. at 729 n.22.

Trooper Chambers's testimony was improper because it "express[ed] absolute certainty" that the fingerprint found on the magazine of the firearm corresponded to the defendant.  See Gambora, 457 Mass. at 729.  The defendant contends that the testimony created a substantial likelihood of a miscarriage of justice because it provided a link between the defendant and the weapon.  The defendant's argument is belied, however, by the plethora of other evidence tying the defendant to the firearm.[9]  See, e.g., Armstrong, 492 Mass. at 357-358 (no substantial likelihood of miscarriage of justice where evidence linking defendant to crime besides fingerprint evidence was strong).  For example, the defendant's own trial testimony acknowledged

_____

[9] We also note that the remainder of defense counsel's cross-examination of Chambers elicited testimony regarding the scientific community's consensus regarding the fallibility of fingerprint identification, and that this theme was reiterated by defense counsel in closing arguments.  See Armstrong, 492 Mass. at 357, quoting Commonwealth v. Fulgiam, 477 Mass 20, 45, cert. denied, 583 U.S. 923 (2017) ("the vigorous cross-examination of the analyst countered any possible misconception that individualization is infallible").

that he owned the firearm recovered from Interiano and Pineda's house. The jury also watched a video recording of the defendant's statement to police, wherein he also stated that he owned the firearm, stated and demonstrated how he had used it to shoot the victim, and described the steps he had taken to hide the firearm after the murder. Furthermore, Interiano testified at trial and corroborated the account of the two men hiding the firearm in the basement. Given this evidence, any erroneous testimony by Chambers did not create a substantial likelihood of a miscarriage of justice.

ii. Ballistics testimony. The defendant also argues that improper testimony by the Commonwealth's ballistics expert as to the scientific degree of certainty of ballistics evidence created a substantial likelihood of a miscarriage of justice by suggesting to the jury it was scientifically certain that the firearm recovered from Interiano and Pineda's house was the murder weapon. Defense counsel did not object to the testimony, so we consider whether any improper testimony from the ballistics expert created a substantial likelihood of a miscarriage of justice. See Yat Fung Ng, 489 Mass. at 247.

At trial, State police ballistics expert Trooper Michael Bonasoro testified as to tests he had conducted with the firearm recovered from Interiano and Pineda's house. Based on the results of those tests, Bonasoro concluded that the firearm

recovered from the house was the murder weapon. Specifically, Bonasoro testified that the unique marks found on the cartridge casings at the scene, when compared to casings from test fires of the firearm, enabled him "to form an opinion beyond a reasonable doubt of ballistic certainty that these marks were produced from" the firearm recovered from the house. Bonasoro also agreed that his statement was made "with a degree of scientific certainty."

"Where a qualified expert has identified sufficient individual characteristic toolmarks reasonably to offer an opinion that a particular firearm fired a projectile or cartridge casing recovered as evidence, the expert may offer that opinion to a 'reasonable degree of ballistic certainty.'" Commonwealth v. Pytou Heang, 458 Mass. 827, 848 (2011). We have specifically disapproved of the use of "[p]hrases that could give the jury of an impression of greater certainty." Id. at 849.

Here, Bonasoro's testimony that the firearm recovered from Interiano and Pineda's house was the weapon that discharged the casings recovered from Elmwood Street "beyond a reasonable doubt of ballistic certainty" was improper. See Pytou Heang, 458 Mass. at 848. The proper formulation is, as stated supra, "to a reasonable degree of ballistic certainty." Id. It was also improper for Bonasoro to agree that his statements were made

"with a degree of scientific certainty." We have expressly stated that "[t]he phrase 'reasonable degree of scientific certainty' should . . . be avoided because it suggests that forensic ballistics is a science, where it is clearly as much an art as a science." Id. at 849. Bonasoro's formulation, albeit somewhat different, invites similar confusion. Therefore, we must determine whether Bonasoro's improper testimony created a substantial likelihood of a miscarriage of justice, meaning that the error likely influenced the jury's decision. See Yat Fung Ng, 489 Mass. at 247.

Because there was ample evidence tying the firearm to the murder outside of Bonasoro's testimony, we conclude that there was no substantial likelihood of a miscarriage of justice. See Armstrong, 492 Mass. at 357-358. The defendant admitted in his testimony at trial that he owned the firearm recovered from Interiano and Pineda's house, and further admitted that he had brought it to the house on the night of the murder. In the video recording of his police interrogation, the jury heard the defendant admit that he shot the victim several times with the firearm and explain the steps he took to hide the firearm after committing the crime. Interiano's testimony corroborated the account of the defendant returning to the house after his fight with the victim and hiding the firearm in the basement. Finally, the jury heard evidence that the firearm was a .40

caliber pistol, consistent with the .40 caliber casings recovered from the crime scene. Thus, Bonasoro's testimony, although improper, did not create a significant likelihood of a miscarriage of justice. See Armstrong, supra (no substantial likelihood of miscarriage of justice from testimony expressing scientific certainty regarding fingerprint identification where Commonwealth's evidence apart from testimony was strong).

e. Firearm convictions. The defendant was also convicted of unlawful possession of a firearm and unlawful possession of a loaded firearm. On appeal, the defendant argues that following the United States Supreme Court's decision in New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 8 (2022), his convictions should be overturned because the jury were not instructed that the Commonwealth was required to prove beyond a reasonable doubt that the defendant did not have a valid firearms license. Whereas prior to Bruen, licensure was an affirmative defense to a charge of unlawful possession of a firearm, after Bruen we ruled "that the absence of a license is an essential element" of firearm possession offenses. Guardado I, 491 Mass. at 690. We then held in Guardado II, 493 Mass. at 12, that the proper remedy was to remand for a new trial on the firearm charges. See id. ("Because Bruen was decided after the defendant's trial but while the case was pending on appeal, he is entitled to the benefit of the new rule; that is, the right

to have the Commonwealth prove that he lacked a license").

In the present case, the defendant was convicted of possession of a firearm and possession of a loaded firearm without the benefit of requiring the Commonwealth to prove beyond a reasonable doubt that he lacked a firearm license. Accordingly, we vacate those convictions and remand for a new trial on those charges. See Guardado II, 493 Mass. at 12.

f. Review under G. L. c. 278, § 33E. We have carefully reviewed the entire record, pursuant to our duty under G. L. c. 278, § 33E, and find no reason to set aside the verdict or reduce the degree of guilt.

3. Conclusion. For the foregoing reasons, we affirm the defendant's conviction of murder in the first degree. We vacate the defendant's firearm convictions and remand for a new trial on those indictments.

So ordered.